**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff-Appellant-Cross-
      Appellee,

v.

HEARTWAY CORPORATION
d/b/a York Manor Nursing Center,

      Defendant-Appellee-Cross-
      Appellant.

Nos. 05-7011, 05-7016

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 03-CV-534-WH)**

---

Joseph A. Seiner (James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting
Associate General Counsel, and Carolyn L. Wheeler, Assistant General Counsel, with
him on the briefs), Equal Employment Opportunity Commission, Office of General
Counsel, Washington, D.C., for Plaintiff-Appellant-Cross-Appellee.

Jeffrey C. Tasker, Kane, Russell, Coleman & Logan, P.C., Dallas, Texas, for Defendant-
Appellee-Cross-Appellant.

---

Before **TACHA**, Chief Circuit Judge, **EBEL**, Circuit Judge, and **CASSELL**, District Judge.[*]

---

**EBEL**, Circuit Judge.

---

Janet Edwards, who has hepatitis C, was fired from her job at a nursing home. The Equal Employment Opportunity Commission ("EEOC") thereafter sued the nursing home, claiming that Edwards's termination violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213. After the district court partially granted (with respect to the EEOC's punitive damages claim) and partially denied the nursing home's motion for judgment as a matter of law, a jury returned a verdict in favor of the EEOC. In this appeal, we conclude that the district court did not err in partially denying the nursing home's motion for judgment as a matter of law but that it should not have granted the motion with regard to punitive damages. We therefore affirm in part and reverse in part.

## I. BACKGROUND

Janet Edwards has been diagnosed with hepatitis C, a viral disease that is transmitted by blood-to-blood contact. Edwards began regular medical treatment in 2000 and by January 2001 there was no detectable amount of the hepatitis C virus in her blood, although according to her physician she will always have chronic hepatitis. Edwards continued to be treated and monitored for hepatitis through at least July 2003.

---

[*]The Honorable Paul G. Cassell, District Judge of the United States District Court for the District of Utah, sitting by designation.

On August 13, 2001, Edwards applied for a job at York Manor Nursing Center, a nursing home in Muskogee, Oklahoma.[1] The application process included completing a "Physical Requirements Questionnaire" that included the following item: "In order that we may protect our residents from disease, please indicate if you are under a doctor's care or taking medications now." Despite the ongoing monitoring of her hepatitis, Edwards checked the "no" box. She was subsequently hired as a "dietary aide" and eventually became a cook for the York Manor residents and employees.

York Manor first learned that Edwards had hepatitis on April 1, 2002. That day, Edwards accidentally cut her hand at work. Edwards's sister — who also worked at York Manor — sought out Theresa Raines, York Manor's director of nursing, and told her both that Edwards had cut herself and that Edwards had hepatitis. After work, Edwards herself asked to talk to Raines, "off the record," and told Raines about her hepatitis. Two days later, Raines called Edwards and informed her that she would not be allowed to return to work without a doctor's permission. Edwards promptly asked her doctor for a letter clearing her to return to work; he mailed her such a letter, which arrived at her house on April 5. However, that evening, before Edwards had a chance to bring the letter to York Manor, Edwards's kitchen supervisor called to tell her that she was fired.

The next week, Edwards took her doctor's note to Mitchell Townsend, York Manor's facility administrator, and asked to be reinstated as a cook. According to

---

[1]York Manor is owned and operated by Heartway Corporation, the defendant in this case.

Edwards, Townsend refused, saying: "Well, Janet, you having Hepatitis C, you will not work in our kitchen." When Edwards asked him if she was being terminated because of her hepatitis, according to Edwards he replied, "No, I'm firing you because you falsified information on your [job] application." Townsend then ended the conversation.

In June 2002, Edwards filed a discrimination charge with the EEOC. An EEOC investigator recorded that when he called Townsend to discuss Edwards's complaint, Townsend responded by asking: "How would you like to eat food containing her blood, if she ever cut her finger?" The investigator also reported that Townsend "stated that if this got out to their clients they[] would have a mass exodus from their nursing home."

In September 2003, the EEOC filed a complaint on Edwards's behalf against Heartway Corporation. The complaint alleged that Heartway violated Title I of the ADA by firing Edwards "because it regarded her as disabled." The case was eventually tried to a jury. At the close of the EEOC's case in chief, Heartway moved for judgment as a matter of law. Part of Heartway's motion was a challenge to the sufficiency of the evidence showing that Heartway discriminated against Edwards. The district court denied this part of the motion. Heartway's motion also sought judgment as a matter of law on the issue of punitive damages, claiming that there was no evidence that Heartway exhibited malice or reckless indifference. Over the EEOC's objection, the court granted this portion of Heartway's motion, saying that it saw "no basis under [Supreme Court precedent] or under the ADA or under the evidence to send the issue of punitive damages to the jury."

-4-

The case was then submitted to the jury, which found "by a preponderance of the evidence that Heartway discriminated against Janet Edwards due to perceived disability." The jury awarded Edwards $20,000 in compensatory damages and recommended an award of back pay, which the district court awarded in the amount of $1,240.[2]  Following the jury verdict, Heartway renewed its motion for judgment as a matter of law, again contending that the evidence was insufficient to prove the EEOC's *prima facie* case.  The district court denied Heartway's renewed motion.

The EEOC timely filed a notice of appeal and now argues that the district court erred in withholding the issue of punitive damages from the jury.  Heartway timely cross-appealed the district court's denial of its motion for judgment as a matter of law as to the claim of discrimination.

## II.  DISCUSSION

### A.  Heartway's appeal (No. 05-7016)

We first address Heartway's cross-appeal because if Heartway is entitled to judgment as a matter of law, there is no need to address the EEOC's appeal.  Heartway asserts that the district court's partial denial of its motion for judgment as a matter of law was erroneous in two respects.  First, Heartway claims that the EEOC failed to produce sufficient evidence that it "regarded" Edwards as disabled.  Second, Heartway claims that

---

[2]After judgment was entered, the EEOC filed a motion to amend the judgment, arguing that the district court should have followed the jury's recommendation that back pay be awarded in the amount of $30,000.  The district court denied the EEOC's motion on December 10.  The EEOC does not appeal that denial.

the evidence showed that Edwards was terminated for lying on her job application, not because of a disability. We conclude that Heartway was not entitled to judgment as a matter of law on either ground.

### 1. Standard of review

"We review the district court's denial of [a] motion for judgment as a matter of law de novo, applying the same legal standard as the district court." Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1099 (10th Cir. 2001) (quotation omitted).

> A party is entitled to judgment as a matter of law only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position. It is important to note that, in reviewing the record, we will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury. Judgment as a matter of law is appropriate only if there is no legally sufficient evidentiary basis for a claim under the controlling law. We consider the evidence, and any inferences drawn therefrom, in favor of the non-moving party.

Id. (quotation, alterations, and emphases omitted).

### 2. Whether Edwards was "regarded as" disabled

#### a. The applicable law

To prove that Heartway violated the ADA by firing Edwards, the EEOC was required to prove, *inter alia*, that Edwards had a disability. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual *with a disability* because of the disability of such individual in regard to . . . discharge of employees . . . .")

-6-

(emphasis added).[3]  The ADA broadly defines "disability" as follows:

> The term "disability" means, with respect to an individual--
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

Id. § 12102(2).

In claiming that Edwards had a disability, the EEOC has never asserted that either of the first two parts of the above definition apply (*i.e.*, that Edwards *actually* had a qualifying impairment or record of impairment); rather, it has consistently argued only that Heartway *regarded* Edwards as having a substantially limiting impairment.[4]  The applicable EEOC regulations specify that the "regarded as" standard may be met when a

---

[3]It is undisputed that Heartway is a covered entity for purposes of the ADA.  See 42 U.S.C. § 12111(2) ("The term 'covered entity' means an employer . . . .").

[4]In discussing the purpose of the "regarded as" prong of the definition of disability, the EEOC regulations state:

> The rationale for the "regarded as" part of the definition of disability was articulated by the Supreme Court in the context of the Rehabilitation Act of 1973 in School Board of Nassau County v. Arline, 480 U.S. 273 (1987).  The Court noted that, although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling.  "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment."  480 U.S. at 283.  The Court concluded that by including "regarded as" in the Rehabilitation Act's definition, "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment."  480 U.S. at 284.

29 C.F.R. pt. 1630 app.

person "[h]as a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation."  29 C.F.R. § 1630.2(*l*); see also Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999) (stating that the "regarded as" standard is met when "a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities").  Heartway apparently does not dispute that Edwards's hepatitis is a "physical . . . impairment that does not substantially limit [her] major life activities."  Thus, the question is whether Heartway nonetheless *treated* Edwards's hepatitis as "substantially limiting" one or more of her "major life activities."

The only major life activity at issue in this case is the activity of working.  See 29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as . . . working.").[5]  The

_____

[5]The Supreme Court has questioned whether "working" can properly be considered a major life activity.  See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 200 (2002) ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much . . . ."); Sutton, 527 U.S. at 492 ("We note . . . that there may be some conceptual difficulty in defining 'major life activities' to include work . . . .").  However, "[i]n accordance with EEOC regulations, this court has recognized 'working' as a major life activity," MacKenzie v. City and County of Denver, 414 F.3d 1266, 1275 (10th Cir. 2005), and Heartway does not contest that conclusion in this case.  See also Lanman v. Johnson County, Kan., 393 F.3d 1151, 1157 (10th Cir. 2004) ("Working is a major life activity.").  Nonetheless, we note that even under the EEOC regulations, the major life activity of "working" is to be used only as a last resort:

> If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered.  If an individual is substantially limited in any other major life activity, no determination should be made as to whether the

(continued...)

-8-

EEOC regulations state that "[w]ith respect to the major life activity of working,"

> [t]he term "substantially limit[ed]" means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

Id. § 1630.2(j)(3)(i) (quotation marks added); see also Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994) (applying this regulation). Thus, to prevail on its "regarded as" claim, the EEOC was required to prove by a preponderance of the evidence that Heartway treated Edwards's hepatitis as "significantly restrict[ing]" her "ability to perform either a class of jobs or a broad range of jobs" as compared to similarly trained persons. See, e.g., Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1133 (10th Cir. 2003).

The Sixth Circuit has explained that it is particularly difficult for a plaintiff to prevail on this type of claim:

> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the

_____

[5](...continued)
individual is substantially limited in working.

29 C.F.R. pt. 1630 app; see also Sutton, 527 U.S. at 492 ("[E]ven the EEOC has expressed reluctance to define 'major life activities' to include working and has suggested that working be viewed as a residual life activity . . . as a last resort.").

plaintiff's task becomes even more difficult.

Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001).  Our cases agree that there is a strong subjective component to this inquiry.  In Nielsen v. Moroni Feed Co., 162 F.3d 604 (10th Cir. 1998), the former president of a farming cooperative sued the cooperative after he was fired by its board of directors.  Id. at 606–07.  He claimed that comments made by the board members showed that they had fired him because they "regarded" him as disabled because he was illegally using drugs.  Id. at 611.  This, he claimed, violated the ADA since the board members had treated his drug addiction as substantially limiting him in the major life activity of working.  Id.  We affirmed the grant of summary judgment to the cooperative

> [b]ecause Nielsen merely presented evidence suggesting that Moroni Feed no longer believed him capable of performing his duties as President of the co-op, but presented no evidence whatsoever that Moroni Feed believed any perceived illegal drug addiction on his part significantly restricted his "ability to perform either a class of jobs or a broad range of jobs in various classes."

Id. at 612 (quoting Bolton, 36 F.3d at 942).  As this quote indicates, for an employee to prevail on a "regarded as" claim with respect to the major life activity of working, there must be sufficient evidence that the employer *subjectively* believed the employee to be significantly restricted as to a class of jobs or broad range of jobs in various classes.  See also Doebele, 342 F.3d at 1133; Tate v. Farmland Industries, Inc., 268 F.3d 989, 1000 (10th Cir. 2001); McKenzie v. Dovala, 242 F.3d 967, 971–72 (10th Cir. 2001); Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110, 117 (1st Cir. 2004).  There will often not be evidence on this point, but it is not an insurmountable showing.

-10-

Furthermore, although the above inquiry is strongly subjective, the question of *what constitutes* a "class of jobs" or "broad range of jobs in various classes" is an objective question. That is, there need not be evidence that the employer knew or believed that the group of jobs from which the employer viewed the employee as restricted constituted (or included) a "class of jobs" or a "broad range of jobs in various classes." However, that the inquiry is an objective one does not mean that there are bright-line standards as to what a "class of jobs" is.[6] The Supreme Court, in addressing the meaning of the terms "class of jobs" and "broad range of jobs," has "only spoken in generalities thus far." Rossbach v. City of Miami, 371 F.3d 1354, 1360 (11th Cir. 2004) (per curiam). The Court has said the following:

> To be substantially limited in the major life activity of working, . . . [an employee] must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from

_____

[6]There is, however, some broad guidance in the regulations and the case law. The EEOC's regulations and interpretive guidance state that "heavy labor jobs," "jobs that involve manual labor," "semi-skilled jobs," and "jobs requiring use of a computer" are classes of jobs. EEOC Compliance Manual § 902.8; 29 C.F.R. pt. 1630 app.; EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* I-2.2(a). Without implying that we endorse all of the following holdings, we note that other circuits have indicated that, *e.g.*, truck driving, DePaoli v. Abbott Labs., 140 F.3d 668, 673 (7th Cir. 1998), "assembly line jobs," see id., "manufacturing jobs," McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 370 (6th Cir. 1997), welding jobs, Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995), and "animal care jobs," Broussard v. Univ. of Cal., at Berkeley, 192 F.3d 1252, 1259 (9th Cir. 1999) (alteration omitted), are all classes of jobs. And although "police officer" is not a class of jobs, Rossbach v. City of Miami, 371 F.3d 1354, 1361 (11th Cir. 2004) (collecting cases), "law enforcement positions" may constitute such a class. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 764 (3d Cir. 2004).

-11-

a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Sutton, 527 U.S. at 492. Looking to similarly broad language from the EEOC regulations, we have noted that

> [a] "class of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B). A "broad range of jobs in various classes" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)[(3)](ii)(C).

Sutton v. United Air Lines, Inc., 130 F.3d 893, 904 (10th Cir. 1997) (additional citations omitted), aff'd, 527 U.S. 471 (1999); see also MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1444–45 (10th Cir. 1996).[7]

Based on this authority, it is apparent that the EEOC was required to prove that Heartway treated Edwards's disease as significantly restricting her ability to perform both (1) the job from which she was disqualified, as well as (2) either (a) "jobs utilizing similar training, knowledge, skills or abilities" within her geographical area or (b) a broad range

---

[7]Cf. Black v. Roadway Express, Inc., 297 F.3d 445, 453 n.11 (6th Cir. 2002) ("The EEOC regulations define 'class of jobs' as 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.' . . . The EEOC regulations define 'broad range of jobs in various classes' as 'the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.'").

of "jobs not utilizing similar training, knowledge, skills or abilities" within the geographical area. See Siemon v. AT&T Corp., 117 F.3d 1173, 1176 (10th Cir. 1997). Of course, the EEOC has repeatedly emphasized that the requirement that the relevant jobs constitute a "class" or "broad range" of jobs

> is not meant to require an onerous evidentiary showing. . . . [A]n individual [need not] identify the exact number of jobs using similar or dissimilar skills in a certain geographic area. Further, . . . an individual [need not] count positions or otherwise present a precise number of jobs from which (s)he is disqualified because of an impairment. Instead, the reference to the "number and types" of jobs "only require[s] the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment." Furthermore, in cases where it is clear that an individual is excluded from a class of jobs or a broad range of jobs in various classes, only minimal evidence will be required.

EEOC Compliance Manual § 902.4 (quoting 29 C.F.R. pt. 1630 app.); EEOC v. Rockwell Int'l Corp., 243 F.3d 1012, 1017 (7th Cir. 2001) (favorably quoting the regulation); Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 12 (1st Cir. 1999) (same); Foreman v. Babcock & Wilcox Co., 117 F.3d 800, 805 n.8 (5th Cir. 1997) (same). However, the EEOC retains the burden to relate the characteristics of the "class" or "broad range" of jobs to the performance-restricting consequences of her perceived impairment. See 29 C.F.R. § 1630.2(j)(3)(II)(B) & (C).

### b. Analysis

The question we face in applying the above standards is whether or not there was a "legally sufficient evidentiary basis" for a reasonable jury to conclude that Heartway

treated Edwards's hepatitis as significantly restricting her ability to perform either a class of jobs or a broad range of jobs in various classes. Hampton, 247 F.3d at 1099. We conclude that there was.

Because Townsend was the one who made the decision to fire Edwards, his beliefs regarding Edwards's hepatitis is the relevant inquiry. The evidence supporting the EEOC's claim that Townsend treated Edwards's hepatitis as restricting her ability to work boils down to four items:

1. When Edwards asked Townsend for her job back, he told her: "you having Hepatitis C, you will not work in our kitchen."

2. Townsend asked the EEOC investigator: "How would you like to eat food containing her blood, if she ever cut her finger?"

3. Townsend stated to the EEOC investigator "that if this got out to their clients they[] would have a mass exodus from their nursing home."

4. An EEOC economist, Elvira Sisolak, testified that the tasks, education, and experience relevant to the job of dietary aide correspond to two job groups that, in her opinion, "account for about 55 percent of all jobs in the service worker category" in the relevant geographic area.[8]

As to the first part of our inquiry, there was sufficient evidence to show that Townsend viewed Edwards as substantially limited in her ability to perform her job at

---

[8]Specifically, Sisolak testified that the job requirements for a dietary aide were similar to the requirements of the "health care support" and "food preparation and food service" job groups. Sisolak's opinion considered "Muskogee County and McIntosh County," to be the relevant geographic area, and Heartway does not contest that geographical determination.

-14-

York Manor. His comments to Edwards ("you having Hepatatis C, you will not work in our kitchen") and the EEOC investigator ("How would you like to eat food containing her blood . . . ?") could be taken by a reasonable jury to indicate that Townsend thought it would be unsafe or unsanitary for Edwards to continue cooking food for the nursing home residents and staff.[9] This is evidence that Townsend treated Edwards as limited in her "ability to perform" the job of nursing home cook. Cf. Tate, 268 F.3d at 1000 (finding a genuine issue of material fact as to whether Farmland regarded Tate as significantly restricted in his ability to perform his job because "Farmland's manager . . . stated . . . that he believed *it would have been unsafe* for Tate to drive one of [the company] trucks") (emphasis added); Gowesky v. Singing River Hosp. Sys., 321 F.3d 503, 508 (5th Cir. 2003) (indicating that administrators' discriminatory comments about an employee with hepatitis could perhaps be taken as "question[ing] her fitness to practice emergency room medicine, a professional calling in which routine exposure to blood and bodily fluids might allow the hepatitis C virus to spread"). Similarly, Townsend's expression of concern about a "mass exodus" is evidence that he thought that Edwards could not properly perform her job because of how others might react to her perceived disability. See 29 C.F.R. pt. 1630 app. ("[A]lthough an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as

---

[9]Even though Townsend's comments to the EEOC investigator took place four months after Edwards was terminated, a jury could reasonably infer that those comments were indicative of his beliefs at the time that he terminated Edwards.

-15-

disabling. 'Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment.'") (quoting Arline, 480 U.S. at 283); see also EEOC Compliance Manual § 902.8 ("Common attitudinal barriers include, but are not limited to, concerns about . . . *safety,* insurance, liability, . . . and *acceptance by co-workers and customers*.") (emphases added) (quotation omitted). Therefore, there was sufficient evidence for a reasonable jury to conclude that Townsend viewed Edwards as significantly restricted in her ability to perform her job at York Manor.

This evidence was also sufficient for a jury to conclude that Townsend treated Edwards as significantly restricted in her ability to perform other jobs, in addition to the job she held at York Manor. Specifically, a jury could reasonably view the testimony as showing that Townsend believed Edwards was restricted in her ability to do any kitchen job ("you have Hepatitis C, you will not work in our kitchen")[10] and any other job where there is a chance of bleeding and thereby transmitting hepatitis ("How would you like to eat food containing her blood, if she ever cut her finger?"). Cf. McKenzie, 242 F.3d at 968, 971-72 (evidence that an employer rejected a job application because members of his staff told him that the applicant "would be better off in some other field" supported the

---

[10]Heartway argues that because Townsend used the term "*our* kitchen," it would be unreasonable to conclude that his comment implicated anything more than a job in the York Manor kitchen. We disagree, as a reasonable jury could have construed Townsend's comment as expressing an opinion as to her ability to do kitchen work.

conclusion that the employer considered the applicant to be unfit for a broad range of jobs).[11]

Finally, we conclude that the jobs from which Edwards was regarded as restricted constituted a "class of jobs." As noted earlier, the EEOC regulations define a "class of jobs" as the job from which one is disqualified and "jobs utilizing similar training, knowledge, skills or abilities, within that geographical area." 29 C.F.R. § 1630.2(j)(3)(ii)(B); see also Siemon, 117 F.3d at 1176. The Seventh Circuit has explained the inquiry this way:

> [I]n order to define a meaningful class of jobs, we must look to the training, knowledge, skills, and ability required to perform the particular work, as well as the geographic area reasonably available to the plaintiff. Common job

---

[11]See also Doebele, 342 F.3d at 1117. After Ms. Doebele was diagnosed with bipolar disorder, her doctor recommended that she be placed on a limited work schedule with minimum stress and time off for therapy. Id. at 1126–27. Her supervisors, who apparently viewed her as a physical threat to the other employees, granted only a few of the requested accommodations. Id. at 1127. On appeal, we concluded that there was a triable issue of fact precluding the grant of summary judgment for the employer:

> The record . . . supports the reasonable inference that Ms. Doebele's supervisors viewed her as substantially limited in her ability to perform a broad range of jobs. Although [her supervisors] rejected most of [the doctor's] requested accommodations, they did not consider offering Ms. Doebele another position at Sprint in which [the] recommendations could be implemented, even though Sprint was hiring 200-300 people a week at the time. A fact finder could infer that [the plaintiff's] supervisors believed she was precluded from working in a broad class of positions due to their misperception that she posed a threat to coworkers as a result of her mental illness.

Id. at 1134.

> groupings within a particular industry would also be relevant, just as they are in the somewhat analogous area of defining relevant markets in antitrust cases.

DePaoli, 140 F.3d at 673. The EEOC's expert witness, Elvira Sisolak, testified that jobs in the "health care support" and "food preparation and food serving" census job groups — in the geographical area — required training, knowledge, and skills similar to those utilized in Edwards's job at York Manor. Many — if not most — of these jobs (*e.g.*, operating room assistant, first aid nurse, cook, waitress) would require kitchen work and/or present the risk of cuts and contamination.[12] It is reasonable to conclude, based on this expert evidence and the reasonable inferences to be drawn from Townsend's comments, that Townsend viewed Edwards as significantly restricted in her ability to perform a class of such jobs.

Therefore, we hold that there was a "legally sufficient evidentiary basis" for a jury to conclude that Edwards had a disability as defined by the ADA.

### 3. Whether Edwards was terminated because of a disability

To prove that Heartway violated the ADA, the EEOC was also required to prove that Edwards was terminated *because of* her disability. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability *because of*

---

[12]Cf. Black, 297 F.3d at 453 ("We have recently held that a plaintiff was significantly restricted in his ability to perform a class of jobs or a broad range of jobs in various classes where his injury precluded him from performing at least fifty percent of the jobs previously available to him.").

the disability of such individual in regard to . . . discharge of employees . . . .") (emphasis added).  We conclude that there was sufficient evidence to support the jury's conclusion that Heartway did indeed terminate Edwards because of her disability.

Edwards testified that Townsend told her "you having Hepatitis C, you will not work in our kitchen."  Although this is arguably an ambiguous statement,[13] a jury could reasonably take it to mean that Edwards was being fired *because* she had hepatitis and was therefore (in Townsend's mind) unable to perform her job or other jobs in the same class.  Similarly, Townsend's expression of concern to the EEOC investigator that there would be "mass exodus" if the clients found out that the cook had hepatitis supports a finding that Edwards was therefore fired because she had that disease and was thus restricted in her ability to perform her job and other jobs in the same class.

Heartway spends several pages of its brief trying to show that Edwards actually did lie on her job application and that this provided a sufficient non-discriminatory justification for terminating her.  However, even assuming that Edwards did indeed lie,[14] and even assuming that this would have provided a valid reason for terminating her under the applicable law, a reasonable jury could have nonetheless concluded that she was *actually* fired because of her disability.

---

[13]For example, Heartway argues that it meant something like: "you stated on your job application that you were not under a doctor's care even though you have Hepatatis C; because you lied on your application, you will not work in our kitchen."

[14]We note that in the Order accompanying judgment for the EEOC, the district court concluded that "Ms. Edwards did, in fact, lie on her employment application." That fact question is not before us.

Heartway points to the allegedly "uncontroverted" testimony that Townsend fired

Edwards for dishonesty, not for having a disability. At trial, Townsend stated: "I fired her

for being untruthful on her application for employment." When asked "Did you fire Miss

Edwards because you thought she was disabled?" he responded "No." His testimony also

included this exchange:

> Q. Is untruthfulness a basis for termination at Heartway?
> A. Yes.
> Q. And if you discover any untruthfulness, your common practice is to
> terminate that employee?
> A. Yes.

Similarly, Edwards testified that when she asked Townsend if she was being fired for

having hepatitis, Townsend replied "No, I'm firing you because you falsified information

on your application." Although this testimony certainly could lead a jury to agree with

Heartway's version of the facts, the jury was also entitled to conclude that Townsend was

not entirely truthful at trial and that he misled Edwards when he told her that she was

being fired for lying on her application. See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 151 (2000) ("[A]lthough [in considering a motion for judgment as a matter

of law] the court should review the record as a whole, it must disregard all evidence

favorable to the moving party that the jury is not required to believe [and] . . . give

credence to the evidence favoring the nonmovant as well as that evidence supporting the

moving party that is uncontradicted and unimpeached, at least to the extent that that

evidence comes from disinterested witnesses." (quotation omitted)). Heartway is not

entitled to judgment as a matter of law just because there was evidence that, if believed,

would have weighed heavily in favor of Heartway. Based on Townsend's statements to Edwards and to the EEOC investigator, and despite the contrary testimony at trial, a reasonable jury could conclude that Edwards was fired for having a disability, rather than for Heartway's proffered reason.

Therefore, because there was a "legally sufficient evidentiary basis" for concluding that Edwards had a disability (defined as "regarded as having an impairment") and that she was fired because of her disability, the district court did not err in denying Heartway's motion for judgment as a matter of law. We therefore affirm that denial.

## B.  The EEOC's appeal (No. 05-7011)

We now turn to the EEOC's appeal from the district court's decision to grant Heartway's motion for judgment as a matter of law on the issue of punitive damages. We conclude that the district court did indeed err in granting the motion; a remand is therefore in order.

### 1.  Standard of review

"Whether sufficient evidence exists to support punitive damages in an ADA case is a question of law which is reviewed de novo." Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1254 (10th Cir. 2005). We also review *de novo* the grant of judgment as a matter of law to Heartway and will affirm

> only if the evidence points but one way and is susceptible to no reasonable inferences which may support the [EEOC's] position. . . . Judgment as a matter of law is appropriate only if there is no legally sufficient evidentiary basis for a claim under the controlling law. We consider the evidence, and any inferences drawn therefrom, in favor of the [EEOC].

-21-

Hampton, 247 F.3d at 1099 (quotation, alterations, and emphases omitted).

### 2. Analysis

"An ADA plaintiff may seek punitive damages if his employer acted with 'malice or with reckless indifference to the plaintiff's federally protected rights.'" Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 914 (10th Cir. 2004) (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999)). "To satisfy this standard, the employer must engage in prohibited conduct with knowledge that it may be acting in violation of federal law, not mere awareness that it is engaging in discrimination." Praseuth, 406 F.3d at 1254; see also Dilley v. SuperValu, Inc., 296 F.3d 958, 966 (10th Cir. 2002) ("To satisfy this standard, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law.") (quotation omitted). Thus, the question in this appeal is whether there was evidence presented from which a jury could reasonably conclude that Heartway engaged in prohibited conduct "with knowledge that it may be acting in violation of federal law" or "in the face of a perceived risk that its actions would violate federal law."

In EEOC v. Wal-Mart Stores, Inc., we upheld an award of punitive damages due to Wal-Mart's failure to accommodate Amaro, a deaf employee. 187 F.3d 1241 (10th Cir. 1999). Our decision was based in part on evidence that the store manager who allegedly discriminated knew the requirements of the ADA:

> The store manager, who ultimately approved Amaro's suspension, testified that he was familiar with the accommodation requirements of the ADA and its prohibition against discrimination and retaliation in the workplace. From this

-22-

evidence, a reasonable jury could have concluded that Wal-Mart intentionally discriminated against Amaro in the face of a perceived risk that its action would violate federal law.

Id. at 1246.  Thus, Wal-Mart Stores indicates that where (1) there is sufficient evidence for the jury to decide whether an employer intentionally and illegally discriminated on the basis of a disability and (2) there is evidence that the employer knew the requirements of the ADA, it is proper for a punitive damages instruction to go to the jury.

The EEOC asserts that evidence that Townsend knew of the requirements of the ADA is found in one section of Townsend's testimony at trial:

> Q.  In some prior jobs that you've had, you have received training about the [ADA]; right?
> A.  Some training.
>
> Q.  And you were aware, based on your training that you received, that it was against the law to fire someone because they had a disability; is that right?
> A.  That's right.
>
> Q.  And you knew, based on your training about the [ADA], in April of 2002, that it was against the law simply because someone had been diagnosed with Hepatitis C; right?
> A.  Correct.

The EEOC argues that this testimony shows that Townsend knew his obligations under the ADA, and that the jury should have been able to evaluate whether this shows that he acted "with knowledge that [he] may be acting in violation of federal law."  We agree and conclude that the district court erred in not letting the jury determine the question of punitive damages.

-23-

Heartway tries to poke holes in the above-quoted testimony from Townsend on various grounds. First, it argues that the second question quoted above "pertains to firing an employee who has an actual disability" and therefore does not address "whether Townsend knew that firing someone who is not disabled but is merely 'regarded' as disabled violates an employee's rights." The problem with this argument is that under the ADA, "disability" is *defined to include* a perceived or "regarded as" disability. See 42 U.S.C. § 12102(2) ("The term 'disability' means, with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded as having such an impairment."). Thus, Townsend's testimony could show that he knew it was against the law to fire someone because of a perceived disability, as well as because of an "actual" disability. Of course, the opposite is also possible — Townsend may not have known of the ADA's specialized definition of "disability," and if so, Heartway was entitled to bring that fact out on cross-examination and to argue it to the jury. Ultimately, however, it was for the jury to decide whether Townsend knew it was a violation of the ADA to fire someone because they were "regarded as" disabled.

Second, Heartway argues that "the phrase 'against the law' is a colloquial term that has many meanings and is not necessarily tantamount to a violation of an employee's rights under the ADA." Although that may be true, whether Townsend understood this phrase to be referring to the ADA is a question of fact that is properly left to the jury.

-24-

And, given the context of the questioning — especially the fact that use of this phrase immediately followed a question about the ADA — a jury would certainly have good reason to conclude that Townsend understood "against the law" to mean "in violation of the ADA."

Third, Heartway argues that although Townsend's response to the third question may have established that he knew that firing someone *solely* because they have hepatitis is against the law, that does not prove that he knew that firing someone based in part — but not solely — on that diagnosis violates the ADA. Here again, the meaning of the question and Townsend's response is an issue properly placed before the jury. It is not so clear that we could conclude as a matter of law that this exchange only referred to firing someone solely because they have hepatitis. Heartway should have addressed this on cross-examination if it thought the question was ambiguous.

Finally, Heartway argues that the third question shows that Townsend did not really understand the requirements of the ADA because in actuality, it is *not* a violation of the ADA to terminate someone simply because they have been diagnosed with hepatitis. The hepatitis must also limit a major life activity (or be perceived as limiting a major life activity). Although that is certainly true, it is also irrelevant to our decision. A jury could reasonably conclude from the context of the question and answer that Townsend was admitting to knowing that it was a violation of the ADA to fire someone because *they were disabled* due to having hepatitis. In addition, if Townsend thought it was a violation of the ADA to fire someone *solely* because they had hepatitis, then as a matter of logic it

follows that he would have *also* thought it a violation of the ADA to fire someone because they had hepatitis *and* were disabled.

Therefore, we conclude that the district court erred in granted Heartway judgment as a matter of law on the issue of punitive damages.

### 3. Remedy

Our above conclusion requires that we remand for a new trial, solely on the issue of punitive damages. See Youren v. Tintic Sch. Dist., 343 F.3d 1296, 1309 (10th Cir. 2003) ("[T]he district court erred in preventing the jury from considering the imposition of punitive damages . . . . On remand, the district court should hold a trial limited to the issue of punitive damages . . . ."); Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1188 (10th Cir. 1999) (reversing a directed verdict on the issue of punitive damages and remanding "for the specific purpose of submitting to a jury the issue of punitive damages"). We will leave it up to the district court to determine how best to proceed with the punitive damages issue on remand.

## CONCLUSION

We AFFIRM the district court's partial denial of Heartway's motion for judgment as a matter of law but REVERSE the grant of judgment as a matter of law as to punitive damages and REMAND for a new trial on that issue.