**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 11, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff,

and

KENT DUTY,

     Intervenor Plaintiff - Appellant,

v.

BNSF RAILWAY COMPANY,

     Defendant - Appellee.
_____

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff - Appellant,

and

KENT DUTY,

     Intervenor Plaintiff,

v.

BNSF RAILWAY COMPANY,

     Defendant - Appellee.

No. 15-3259

No. 15-3265

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:12-CV-02634-JWL)**
_____

Barbara L. Sloan (P. David Lopez, General Counsel, Jennifer S. Goldstein, Associate General Counsel, and Margo Pave, Assistant General Counsel, with her on the briefs), Equal Employment Opportunity Commission, Washington, D.C., for Plaintiff-Appellant.

Marie L. Gockel (Lynne Jaben Bratcher, with her on the briefs), Bratcher Gockel Law, L.C., Kansas City, Missouri, for Plaintiff Intervenor-Appellant.

Bryan P. Neal (Stephen F Fink, with him on the brief) Thompson & Knight, LLP, Dallas, Texas, for Defendant-Appellee.
_____

Before **LUCERO**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Kent Duty filed this suit against a railroad company, BNSF Railway Company ("BNSF"), after he applied to work there as a locomotive electrician. Duty has an impairment that limits his grip strength in his right hand. Fearing that Duty would fall from ladders, BNSF revoked his offer for employment. Duty and the Equal Employment Opportunity Commission (the "Commission") sued BNSF for employment discrimination under the Americans with Disabilities Act (the "ADA"). The ADA protects disabled workers from discrimination. But it limits its protection by recognizing that not all impairments are disabilities. Applying the ADA's

2

definition of "disability," the district court found that Kent Duty was not disabled and granted summary judgment to BNSF. On appeal, we affirm.[1]

## BACKGROUND

### I.   Duty's Injury and Work History

At age sixteen, a car accident left Kent Duty with severe injuries to his right arm. He suffered from nerve and muscle damage, which caused some of the joints in his right hand to contract into a visible "clawhand." Duty Opening Br. at 10. After two years of physical therapy, Duty's right hand reached its maximum potential recovery, but he still lacks grip strength and cannot oppose his right thumb or perform fine-motor activities. With practice, he's retrained himself to become left-handed and use his right hand as a "helper" to assist him in various tasks. The tasks that he can perform include holding, grasping, turning, and pulling. He can also pinch objects with his thumb and index finger and carry twenty-five pounds with his right arm and up to five pounds with his right hand.

Even with his impairment, Duty has been a capable employee. For over twenty years, he worked as a maintenance manager for a dry-cleaning company where he installed and maintained its equipment and buildings. There, he gained electrical experience and worked with a variety of tools including drills, saws, wrenches, sanders, and blow guns. He could climb ladders and perform all of his job functions.

---

[1] We grant Duty's motion to seal portions of the appendix.

His employer considered him a valuable employee and gave him consistent raises and bonuses.

## II.    Duty's Application to BNSF

When his employer declared bankruptcy, however, Duty started looking for another job. He applied to work at BNSF as a locomotive electrician. The job posting stated that BNSF expected its locomotive electricians to climb on and off locomotives and equipment, work around heavy machinery, lift equipment, use hand tools, and maintain and repair high-voltage electrical equipment.

Duty interviewed with a panel of BNSF employees who evaluated his electrical experience. Based on his work history, the panel recommended him for employment. Members of the panel noticed his hand condition but didn't factor it into their consideration. BNSF made Duty a conditional job offer in which it explained that Duty would have to pass a background check and drug screening, and complete a medical-history questionnaire.

On the questionnaire, Duty revealed that he had nerve trauma and had undergone surgery in the past. BNSF's third-party medical contractor, Comprehensive Health Services, contacted Duty and arranged a medical exam with its physician, Dr. Gil Wright. Because of Duty's answers to the questionnaire, Dr. Wright performed an occupational assessment and examined Duty's musculoskeletal capabilities. His exam showed that Duty had a normal range of motion in his right shoulder and elbow, but that his range of motion in his right wrist, particularly his backward movement (dorsi-flexion), was zero when a normal degree of range is 60.

4

The exam also revealed other abnormal results. On his written opinion form, Dr. Wright checked the box "Not Qualified – further evaluation required." EEOC App. vol. 5 at 1343. Because Health Services is an information-gathering service, it can only recommend that BNSF disqualify an employee from service but cannot itself disqualify anyone. Health Services sent its evaluation to BNSF's in-house medical staff where the chief medical officer, Dr. Michael Jarrard, reviewed it.

Dr. Jarrard is an occupational-medicine physician. He determines an employee's fitness for work and has the authority to disqualify an employee from service. When Dr. Jarrard reviewed Dr. Wright's findings, he was principally concerned with Duty's lack of grip strength and his ability to satisfy BNSF's three-point-contact rule, a safety standard that applies to climbing in the workplace.

The parties dispute the specifics of BNSF's three-point-contact rule. The rule comes from the Occupational Safety and Health Administration (OSHA), a federal agency that sets minimum workplace health and safety standards. OSHA's version of the rule requires that employees maintain three points of contact when climbing, which means that two feet and one hand or two hands and one foot contact the ladder at all times. From Dr. Jarrard's understanding, the rule requires that employees have the strength to support their entire body weight with one hand to prevent falls when they lose their footing.

Before he could determine whether Duty qualified for the position, Dr. Jarrard needed additional information on Duty's grip, grasp, and pinch strength.

### III. BNSF Revokes Duty's Offer

Dr. Jarrard, through his medical team, notified Duty that he needed a Functional Capacity Evaluation from a physical or occupational therapist measuring Duty's full range of motion; his grip, pinch, and palmer-grip strength; and his fingertip dexterity. Duty wrote back explaining that he could use his hand and asked whether the exam was necessary. EEOC App. vol. 6 at 1382. When no one responded, Duty had the evaluation done.

The evaluation revealed that Duty had a passive, but not active, range of motion in his right fingers, meaning those fingers couldn't move on their own but could be moved by another force (they were flexible). The test measured his grip strength at 7.5 pounds, his two-point- and three-point-pinch strength at zero pounds, and his lateral-pinch strength at 2.5 pounds. It concluded that Duty had a "functional hook grip," which he could use to "handle materials with [his] right [upper extremity]/hand." EEOC App. vol. 6 at 1359.

After Duty submitted the results to BNSF, Dr. Jarrard interpreted them to mean that Duty had "flaccid paralysis," which he explained accurately as lacking active movement. EEOC App. vol. 4 at 1142. But he also assumed that Duty would use his wrist or elbow to hook ladder rungs when climbing (which was inaccurate because Duty could use his hand as a hook). In the end, Dr. Jarrard determined that Duty wasn't medically qualified due to his "inability to support [his] body weight with one hand during mandatory three point contact when climbing on and off locomotives." EEOC App. vol. 7 at 1427.

6

On December 29, 2008, BNSF e-mailed Duty notifying him that it had revoked his offer. The e-mail stated that he "may be qualified for other BNSF positions such as dispatcher, yard master or clerk should [he] choose to apply and other positions [were] available." *Id.* Duty never applied to any other positions at BNSF, stating they didn't interest him.

## IV. Duty Sues BNSF for Disability Discrimination

In February 2009, Duty filed a Charge of Discrimination with the Commission and the Kansas Human Rights Commission alleging that BNSF had discriminated against him based on his disability when it failed to hire him for the locomotive-electrician position. In 2012, the Commission sued BNSF on Duty's behalf, claiming disability discrimination in violation of the ADA, 42 U.S.C. §§ 12112(b)(1) and (d)(3). Duty intervened, adding an additional count for retaliation. In its position statement to the Commission, a human-resources manager from BNSF, Tamala Cleaver, stated that Duty's impairment posed a risk "with respect to the job tasks of climbing . . . [and] firmly gripping hand tools with both hands." EEOC App. vol. 6 at 1409. BNSF moved for summary judgment on all claims.

The district court found insufficient evidence that Duty had a "disability" within the ADA's definition, so it granted BNSF summary judgment on all claims. On appeal, Duty and the Commission (collectively referred to as "Plaintiffs") concede that Duty does not have an actual physical impairment that rises to a protected disability. Nevertheless, Plaintiffs contend he is disabled under the ADA because BNSF regarded him as disabled.

7

## DISCUSSION

To establish a prima facie case of discrimination under the ADA, Plaintiffs must show that (1) Duty is disabled; "(2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job he holds or desires; and (3) [BNSF] discriminated against him because of his disability." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1189 (10th Cir. 2007). This case turns on element one—whether Duty is disabled; and therefore, we do not address the second or third elements.

## I.      Standard of Review

Because the district court granted summary judgment, our review is de novo. *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting *Zwygart v. Bd. of Cty. Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007)).

Because summary judgment rested on element one, disability, we briefly review the law surrounding this term and then analyze the parties' arguments.

8

**II.    ADA Framework**

The ADA[2] defines "disability" in three ways. A disability is either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiffs have limited their appeal to subsection (C), the "regarded as" definition. This definition recognizes "that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284 (1987).

To show that Duty is disabled under this definition, Plaintiffs must present evidence showing that BNSF subjectively believed either (1) Duty "has a substantially limiting impairment" that he doesn't have, or (2) Duty "has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Under both tests, we ask whether the employer mistakenly believed that the plaintiff was substantially limited in performing a major life activity. *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1086 (10th Cir. 2008). "Major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

---

[2] Congress amended the ADA through the ADA Amendments Act of 2008, which became effective on January 1, 2009 (after the alleged discriminatory conduct in this case arose). Because the Amendment does not apply retroactively, we apply the law as it stood prior to its effective date. *Carter*, 662 F.3d at 1144.

learning, and working." *Sutton*, 527 U.S. at 480 (quoting 29 C.F.R. § 1630.2(i)) (internal quotation marks omitted). Plaintiffs argue that BNSF mistakenly believed Duty's impairment substantially limited him in the major life activity of working; and, Duty adds, the major life activity of performing manual tasks. With that framework, we address both major life activities below.

### A.      Working as a Major Life Activity

Plaintiffs contend that BNSF mistakenly believes Duty's impairment substantially limits him in the major life activity of working. In response, BNSF asserts that it only considered Duty for "the single job" he applied for. Appellee Response Br. at 36.

When the major life activity at issue is working, a plaintiff stretches the ADA to its "farthest reaches." *Dillon v. Mountain Coal Co.*, 569 F.3d 1215, 1219 (10th Cir. 2009) (quoting *E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1162 (10th Cir. 2006)). To survive summary judgment, Plaintiffs must present some evidence that BNSF believed Duty was significantly restricted in his ability to perform both (1) the locomotive-electrician job, and (2) either (a) "jobs utilizing similar training, knowledge, skills or abilities" within the geographical area, or (b) a broad range of "jobs not utilizing similar training, knowledge, skills or abilities" within the geographical area. *Heartway*, 466 F.3d at 1162 (quoting *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997)). Though not an "insurmountable showing," *id.* at 1163, it's "safe to assume employers do not regularly consider the panoply of other

jobs their employees could perform." *Id.* at 1162 (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001)).

This inquiry has subjective and objective components, best broken into three steps. *See generally id.* at 1163, 1165-66 (analyzing the subjective and objective inquiries in three parts). First, we ask: did the Plaintiffs show that BNSF subjectively believed Duty was disqualified from the locomotive-electrician job? *Id.* at 1165. If we answer yes, on step two we ask: did BNSF also subjectively believe that Duty was disqualified from any additional jobs? *Id.* at 1166. If we also answer yes, on step three we ask the objective question: did these additional jobs amount to a "class of jobs" or a "broad range of jobs in various classes"? *Id.* at 1165-66. Only if Plaintiffs show evidence of each will we reverse the summary-judgment grant. As an initial matter, on step one, the evidence is undisputed that BNSF subjectively believed Duty was disqualified from the locomotive-electrician job. But, as discussed below, we find that Plaintiffs fail on step two. Therefore, we do not address the objective inquiry of whether any additional jobs amount to a class or broad range of jobs.

On our second step, whether BNSF regarded Duty as unable to perform other jobs aside from the locomotive-electrician position, we examine whether the evidence shows that BNSF subjectively believed that Duty was unable to perform other jobs. The Plaintiffs present the following evidence:

1. BNSF's December 29, 2009 e-mail to Duty revoking his conditional offer;

2. Dr. Jarrard's statement that Duty could only grip with his wrist or elbow;

3. BNSF's lack of written materials about its three-point-contact rule;

11

4. Dr. Jarrard's statement that the three-point-contact rule applies in other industries;

5. BNSF's failure to respond to Duty; and

6. BNSF's position statement to the Commission.

First, BNSF's December 29, 2008 e-mail informed Duty that he was "not medically qualified for [the] Locomotive Electrician position" and suggested that he "may be qualified for other BNSF positions such as dispatcher, yard master or clerk." EEOC App. vol. 7 at 1427. Duty argues that when BNSF suggested "dispatcher, yard master or clerk," *id.*, it intentionally excluded forty-six to forty-seven other jobs at BNSF. But generally, an offer to apply to other positions rebuts a regarded-as claim when the major life activity is working. *See McGeshick v. Principi*, 357 F.3d 1146, 1151 (10th Cir. 2004). *But see Justice*, 527 F.3d at 1088 (holding that an employer's offering an employee a different position in its factory was relevant but didn't entitle the employer to summary judgment). Duty relies on *Justice* to argue that his offer doesn't fall under this rule. In *Justice*, the employer admitted he thought the plaintiff could do "only about two jobs in the plant." 527 F.3d at 1088. So when the employer offered the plaintiff a janitorial position, we held that its offer didn't rebut its previous statement and the other evidence showing it regarded the plaintiff as unable to perform additional jobs. *Id.* at 1088-89. Here, the record lacks similar sweeping comments; and standing alone, a reasonable jury couldn't infer that the three positions in BNSF's e-mail excluded all others.

Second, Dr. Jarrard described Duty's right hand as having "flaccid paralysis" instead of a functional hook grip. EEOC App. vol. 4 at 1142. Duty indeed has a functional hook grip and can grab ladder rungs with his impaired hand; but Dr. Jarrard incorrectly assumed he used his elbow or wrist. Nonetheless, as Dr. Jarrard correctly perceived, Duty couldn't support his body weight with one hand, and so he was incapable of complying with BNSF's three-point-contact rule. *See Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1241 (10th Cir. 2001) (explaining that "[w]here the recognition of Plaintiff's limitations is not an erroneous perception, but is instead a recognition of fact, a finding that Plaintiff was regarded as disabled is inappropriate"). It's well established that an employer's belief that "an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general." *McGeshick*, 357 F.3d at 1151 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)) (internal quotation marks omitted). In *McGeshick*, the evidence showed that the employer perceived the plaintiff as a safety hazard because of symptoms related to his Meniere's disease, but it encouraged him to apply for other jobs. *Id.* at 1148. We held that where the employer's "perception of [the plaintiff's] limitation is confined to concerns about specific tasks unique to the job," the plaintiff had failed to show that the employer regarded him as substantially limited in his ability to work. *Id.* at 1150-51. Likewise, Dr. Jarrard's perception of Duty's hand related to a specific task, complying with the three-point-contact rule. That, combined with BNSF's e-mail inviting Duty to apply to other positions, cannot establish that BNSF regarded Duty as unable to work in general.

13

Third, Duty points to BNSF's lack of written materials on its three-point-contact rule to argue that BNSF subjected Duty to a stricter standard than other employees. Without evidence that BNSF applies a less-rigid standard to its unimpaired employees, the absence of a written policy fails to show that BNSF intended to discriminate against Duty. *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002) (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)) (explaining that, under Title VI, "[t]o prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker . . . adopted the policy at issue 'because of, not merely in spite of, its adverse effects upon an identifiable group'") (internal quotation marks omitted). In fact, the evidence suggests that BNSF's stricter version of the three-point-contact rule may be necessary to protect its locomotive electricians from serious injuries. Dr. Jarrard stated that the locomotive workplace is unforgiving and that one employee lost both his legs after falling from a train. *See E.E.O.C. v. Schneider Nat'l, Inc.*, 481 F.3d 507, 510 (7th Cir. 2007) (explaining that an employer "is entitled to determine how much risk is too great for *it* to be willing to take") (emphasis in original); *Detterline v. Salazar*, 320 F. App'x 853, 858-59 (10th Cir. 2009) (unpublished) (explaining that employers can consider the physical demands of a particular job and how an employee's physical capabilities might affect those demands).

Fourth, Dr. Jarrard stated that the three-point-contact rule is "well-established in industrial settings." EEOC App. vol. 4 at 1113-14. The Commission argues that this statement shows Dr. Jarrard considered Duty unfit for other industries. To agree, we must assume that Dr. Jarrard believed these other industries carried the same risks as the

14

locomotive industry. The record contradicts such an assumption. Rather, the record shows that Dr. Jarrard believed that the locomotive industry heightened the risks associated with a lack of grip strength, and that he balanced these risks against Duty's capabilities.

Fifth, Duty points to Dr. Jarrard's lack of communication as proof that Dr. Jarrard failed to conduct an individualized inquiry. Evidence that an employer failed to conduct an individualized inquiry can show the employer's concerns were based on "myths, fears, and stereotype." *McKenzie v. Dovala*, 242 F.3d 967, 971 (10th Cir. 2001). But here, the evidence shows that Dr. Jarrard determined Duty's fitness after he had the functional-capacity-evaluation results showing that Duty lacked grip strength. Thus, Dr. Jarrard conducted an individualized inquiry.

Sixth, the position statement said that Duty's impairment "posed a significant safety risk with respect to the job task[] of . . . firmly gripping hand tools with both hands." EEOC App. vol. 6 at 1409. The Commission argues that the statement, combined with Dr. Jarrard's beliefs about "flaccid paralysis," show that BNSF considered Duty incapable of "us[ing] a great many tools requiring two hands." EEOC Opening Br. at 15, 44. In doing so, the Commission broadens what was a statement about safety standards to one of tool-use in general. The record counters such a leap. In fact, it shows that Dr. Jarrard believed that Duty *could* use tools. In response to the question "did you perceive that Mr. Duty was unable to use two hands to use tools," Dr. Jarrard responded "No. No. . . . [H]e had significant limitations, but it doesn't mean he had complete inability to do

15

things. . . . So, no it doesn't at all make me think that he could never, or under any circumstances use tools." EEOC App. vol. 4 at 1136.

Further, BNSF's position that Duty could use tools (but just not within an adequate safety margin) is supported by Dr. Jarrard's response to the question "[d]id you have [sic] concern of whether or not Mr. Duty could use a pneumatic wrench," in which he replied, "I had [sic] concern that he could do it safely, use them safely without having the normal grip strength in the right hand." EEOC App. vol. 4 at 1143. And, as stated above, an employer's belief that "an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general." *McGeshick*, 357 F.3d at 1151 (quoting *Chandler*, 2 F.3d at 1393) (internal quotation marks omitted).

Because Plaintiffs have failed to show that BNSF considered Duty unable to perform jobs other than the locomotive-electrician job, the district court properly held that Plaintiffs failed to show BNSF regarded Duty as substantially limited in the major life activity of working.

### B. Performing Manual Tasks

Our conclusion on the major life activity of working doesn't end our "regarded as" analysis because Duty also asserts that BNSF regarded him as substantially limited in the major life activity of performing manual tasks. He asserts that BNSF believed him incapable of climbing ladders using the three-point-contact rule and of gripping tools with both hands. EEOC App. vol. 1 at 56. "[T]o be substantially limited in performing manual tasks," the impairment must prevent or severely restrict activities "of central

16

importance to most people's daily lives." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002). For example, "household chores, bathing, and brushing one's teeth" are manual tasks central to daily life. *Id.* at 202. Meanwhile job-specific tasks aren't "necessarily important parts of most people's lives," and so have "only limited relevance to the manual task inquiry." *Id.* at 201.

Complying with a three-point-contact rule while climbing and gripping tools with both hands are both jobs-centered tasks, which don't amount to major life activities. *See id.* at 200 (stating the court of appeals erred "by focusing on [employee's] inability to perform manual tasks associated only with her job"). Accordingly, Duty has failed to show that BNSF regarded him as unable to perform any task central to his daily life.

## III.    Medical Evaluation

Duty also claims that BNSF violated the ADA by improperly "us[ing] the results of a pre-employment medical 'examination' by its physician to disqualify [him]." EEOC App. vol. 1 at 9. But the medical exam occurred *after* Duty received a conditional offer of employment. When Duty interviewed with a panel of BNSF employees, the panel assessed his job experience and considered whether he could perform electrical work. Without considering his medical qualifications, the panel approved him for a conditional offer. Then, once Duty received the offer, BNSF conducted its medical exams.

Any medical exams, therefore, were post-offer, pre-employment medical exams, which fall under 42 U.S.C. § 12112(d)(3). Thus, if Duty has a claim, it would arise under § 12112(d)(3) rather than (d)(2). Duty generally asserts that BNSF's "medical examination process was not an individualized inquiry" and references subsection

17

(d)(3)(C).[3] Duty Opening Br. at 72. Here, this reference to (d)(3)(C) is important because only disabled individuals have claims for violations of (d)(3)(C). *See Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 960 n.4 (10th Cir. 2002). Because Duty has failed to show that he is disabled, any claims under (d)(3)(C) necessarily fail.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of BNSF and grant Duty's motion to seal portions of the appendix.

---

[3] Duty also references 42 U.S.C. § 12112(d)(4)(A). But Duty failed to allege a violation of this subsection in the district court. Thus, he has waived appellate review. *COPE v. Kansas State Bd. of Educ.*, 821 F.3d 1215, 1222 n.7 (10th Cir. 2016).