FILED
United States Court of Appeals
Tenth Circuit

June 24, 2008

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DAVID M. JUSTICE,

      Plaintiff-Appellant,

v.

CROWN CORK AND SEAL
COMPANY, INC., a Pennsylvania
corporation,

      Defendant-Appellee.

No. 07-8036

---

**ORDER**

---

Before **BRISCOE, McKAY,** and **LUCERO**, Circuit Judges.

---

    Appellant's motion to correct the opinion filed June 3, 2008, is granted.  A

revised opinion, filed nunc pro tunc to June 3, 2008, is attached.

Entered for the Court

Elisabeth A. Shumaker, Clerk

FILED
United States Court of Appeals
Tenth Circuit

June 3, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID M. JUSTICE,

  Plaintiff-Appellant,

v.

CROWN CORK AND SEAL
COMPANY, INC., a Pennsylvania
corporation,

  Defendant-Appellee.

No. 07-8036

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 2:06-CV-66-J)**

---

Richard C. LaFond (Jay Dee Schaefer, Laramie, Wyoming, with him on the briefs), LaFond & Sweeney, LLC, Denver, Colorado, for Plaintiff-Appellant.

Tracy A. Miller (Christopher J. Meister with her on the brief), Ogletree, Deakins, Nash, Smoak and Stewart, P.C., Phoenix, Arizona, for Defendant-Appellee.

---

Before **BRISCOE, McKAY,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

  Plaintiff-Appellant David Justice filed suit in federal district court under

the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, alleging

that his employer, Defendant-Appellee Crown, Cork, & Seal, Co. (Crown) discriminated against him on the basis of his physical impairment. The district court granted summary judgment to Crown, concluding that (1) Justice failed to establish that he was disabled within the meaning of the ADA, a necessary element of his prima facie case; and (2) the evidence showed that Justice posed a "direct threat" to workplace safety. Justice now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's grant of summary judgment to Crown and remand the case for further proceedings.

I.

Crown owns and operates a plant in Worland, Wyoming, that produces aluminum beverage cans. Justice began working as an electrician at the Worland plant in September of 1989, and worked there without difficulty for nearly ten years. In his position as an electrician, Justice was required to work regularly around large machines, including power presses, cutters, conveyors, ovens, spray machines, unwinders, and lubricators. Justice was also required to use hydraulic and electric lifts, climb ladders, and navigate catwalks suspended above the floor of the plant, all of which were outfitted with safety rails. When working at heights, Justice and other employees of the Worland plant used standard safety equipment such as waist belts and harnesses.

In March of 1999, Justice suffered a stroke that impaired his ability to see, speak, walk, balance, and care for himself. Justice's doctors withheld him from

2

returning to work for a short period of time. After intense rehabilitative therapy, Justice regained his ability to perform many of his life activities but suffered permanent impairment to his ability to balance. Justice also continued to suffer from vertigo, or a feeling of movement when there was none. Though these conditions caused Justice to walk with an unstable gait and otherwise appear unsteady, he was able to adapt and was in actuality more agile than he appeared, experiencing little difficulty with walking and standing. He was eventually released to return to work. The medical release set forth several restrictions: "He should not work at heights on ladders or scaffolding. His balance is impaired." Aplt. App'x at 610.

Upon Justice's return to work, Crown initially did not require him to engage in any activities in violation of his medical restrictions. Justice was scheduled alongside other electricians who could perform any tasks that he could not perform due to his restrictions (which occurred infrequently). He was also permitted to work the day shift with reduced hours. While Justice was working under these conditions, Crown did not observe any safety problems with his performance and considered him "a valuable employee" who "could contribute to the company." Id. at 451.

Justice's treating neurologist, Dr. Roger Williams, reexamined him on an annual basis. Following his May 5, 2000 examination of Justice, Dr. Williams opined that Justice had reached maximum medical improvement, and

3

recommended that Justice "continue work restriction[s] that relate to working at unprotected heights, such as on ladders or scaffolding. Working on stepladders no higher than six feet should be relatively safe." Id. at 208. After examining Justice on May 14, 2001, Dr. Williams again recommended that Justice "avoid working on tall ladders or at unprotected heights. Experience has shown he can work effectively and safely on shorter ladders and platform lifts." Id. at 210.

These restrictions notwithstanding, Justice was able to work safely in the Worland plant for approximately two years. A strike began on June 1, 2001, and lasted over eight months, until February of 2002. During this time, Justice did not work at the Worland plant. When Crown's employees returned to work, Crown initially refused to allow Justice and another employee with similar work restrictions to return. After Justice's union filed a grievance and Justice obtained a new work release from Dr. Williams, Crown permitted Justice to return to work in late March of 2002. Dr. Williams's March 2002 work release again recommended that Justice "should not work at unprotected heights. When on extension ladders, scaffolding, cherry pickers, etc., [he] should be restrained with a waist belt and strap." Aplt. App'x at 614.

After Justice returned to work at the plant, he was placed on the night shift, rather than the day shift he worked before the strike. Justice was also assigned a new supervisor, Frank Pacheco, who had not previously supervised Justice directly. Pacheco was unaware of the medical restrictions placed on Justice, and

4

asked Justice to perform tasks that may have been outside his restrictions, such as accessing heights without protection. After observing Justice experiencing what Pacheco believed to be difficulties with balance, Pacheco wrote a memorandum on May 7, 2002, summarizing his observations. Pacheco also had a face-to-face meeting with the Plant Manager and Plant Supervisor about his concerns.[1]

In early October of 2002, Richard Backlund and Brian Rogers, two of Crown's Area Managers, visited the plant. While there, they observed Justice acting in an unsteady manner, swaying, and having difficulty with his balance. Upon learning that Justice had previously been observed acting in a similar manner, the men became concerned for his safety.

On October 15, 2002, Backlund and Rogers held a conference call with several Crown employees, including the Plant Manager and Richard Mangus, the Worland plant's Department Manager for Human Resources, to review Justice's problems. During the call, they discussed their belief that Justice may pose a danger to himself and others at the plant. Following the conference call, Mangus met with Justice and informed him of Crown's concern that although he had not necessarily been working unsafely, "there was potential for injury to himself and others" due to Justice's vertigo and balance problems. Id. at 532. Justice was then placed on an involuntary leave of absence pending further medical

---

[1] Pacheco and Mike Snyder, another supervisor, also noted other problems with Justice's performance, such as memory loss, the failure to complete projects in a timely manner, and general tiredness.

5

evaluation. Crown scheduled an appointment for Justice with a neuropsychologist, but Justice did not attend, stating that he wanted to see Dr. Williams first. Dr. Williams reexamined Justice on October 31, 2002, and concluded that Justice's "minor neurological complaints do not seem to limit his vocational abilities. It is still my opinion that he should not put himself at unnecessary risk, such as working at unprotected heights or in unprotected fashion around hazardous machinery." Id. at 212.

Following Dr. Williams's examination, Justice attended a December 2, 2002 functional capacity evaluation (FCE) with physical therapist Rhonda Wakai. Ms. Wakai prepared an initial report of the FCE on December 9, 2002. Though Justice generally performed well on the tests that Ms. Wakai administered, she did note some concerns: "it is recommended that Mr. Justice utilize safety equipment as is standard to the industry when accessing heights, particularly when balance is required. This would include open beams, scaffolding, ladders, and other similar situations. This is in line with Dr. Williams' recommendations, as well." Aplt. App'x at 117. Based on her examination, Ms. Wakai concluded that Justice was able to work at the "very heavy" Physical Demand Level for an eight hour day according to the United States Department of Labor's Dictionary of Occupational Titles. Id. at 122, 124.

Because Justice's job description was not available at the time of the FCE, Ms. Wakai was unable to draw any conclusions about his ability to physically

6

perform his job. After providing Ms. Wakai with a letter purporting to list the physical demands of Justice's job, Crown invited her to perform an on-site evaluation of Justice's workplace. Accompanied by Richard Mangus, Ms. Wakai toured the Worland plant and observed the areas where electricians were required to work. Whether this tour accurately outlined the requirements of the electrician position is unknown. Neither Justice nor a representative of his union accompanied Ms. Wakai on the tour, and Ms. Wakai did not see an electrician performing the tasks associated with the position during the tour. Following her visit to the Worland plant, Ms. Wakai prepared a report detailing the results of her on-site evaluation.

Ms. Wakai's visit to the Worland plant revealed a number of potential hazards that challenged her perception of her footing and her sense of balance:

> slippery footing, the multiple level changes throughout the physical plant, the frequent tight turns in the catwalk area, the frequent need to crouch under structures, and the occasional need to crouch and make a turn at the same time, bouncy walking surfaces, protruding obstacles, and particularly in one area, the visual distraction of having a catwalk that is a grating type material with a very quickly moving object underneath . . . .

Aplt. App'x at 126-27. Ms. Wakai noted that "the operators have taken many precautions to ensure worker safety." Id. at 127. Nonetheless, she recommended "that Mr. Justice be encouraged to seek employment that presents fewer obstacles to his physical safety." Id. She then left the final approval or disapproval of Justice's workplace with Crown's corporate medical director, Dr. David Spratt.

7

Dr. Spratt examined Justice's medical records, but did not personally evaluate Justice. After examining Justice's records, Dr. Spratt concluded "that Mr. Justice should not work in an assignment that requires him to maintain balance, work at heights, nor work near moving equipment." Aplt. App'x at 571. He did not, however, reach a conclusion as to whether Justice could be permitted to continue his job as an electrician in the Worland plant.

The management of Crown's Worland plant held a meeting with Justice and the president of his local union on February 10, 2003, to discuss the results of the examinations with him. Justice was informed that "he was disqualified from any assignment that requires working at heights or around moving equipment." Id. at 632. Justice was asked what job he felt he could perform in the plant under those limitations and said that he felt he could perform any job available. Though Justice's experience did, in fact, qualify him to perform any job in the plant, he was assigned the position of janitor beginning on February 17, 2003. The position of janitor was the lowest-ranking position in the plant and paid substantially less than Justice had earned as an electrician.

On April 8, 2003, two months after being reassigned to the position of janitor, Justice filed a complaint with the EEOC. After conducting an investigation into Justice's complaint, the EEOC issued a letter on August 31, 2004, finding reasonable cause to believe that Crown had discriminated against Justice in violation of the ADA. When attempts to conciliate the parties failed,

8

the EEOC issued a right-to-sue letter on December 19, 2005. Justice filed this suit in federal district court on March 14, 2006.

Crown moved for summary judgment, arguing that Justice had presented no evidence that he was disabled under the ADA, an essential element of his prima facie case. In the alternative, Crown argued that the evidence showed that Justice posed a direct threat to workplace safety, a defense to his ADA claim. On March 30, 2007, the district court granted summary judgment to Crown, concluding that Justice had not shown he was disabled within the meaning of the ADA, as he had not shown that Crown "regarded him as disabled or suffering an impairment that substantially limits one or more of his major life activities." Aplt. App'x at 812-13. In addition, the court concluded that "Crown rightly considered that [Justice] was a direct threat to himself and others in the workplace." Id. at 815.

## II.

We review a grant of summary judgment *de novo*, "taking the facts and the reasonable inferences to be drawn from them in the light most favorable to the nonmoving party." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002). Applying the same legal standard as the district court, we will affirm "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial burden of presenting evidence to show the absence of a

9

genuine issue of material fact"; if this burden is met, it then becomes the responsibility of the non-moving party "to set forth specific facts showing there is a genuine issue for trial." Trainor, 318 F.3d at 979. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

## A. *Disability under the ADA*

A prima facie case of ADA discrimination consists of three elements: the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.

Zwygart v. Bd. of County Comm'rs, 483 F.3d 1086, 1090 (10th Cir. 2007) (citation omitted). Crown sought (and the district court granted) summary judgment on only the first of these elements, arguing that Justice failed to show that he was a disabled person as defined by the ADA. Under the ADA,

[t]he term "disability" means, with respect to an individual—
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). In claiming that he has a disability, Justice did not assert before the district court and does not now assert that either of the first two parts

10

of this definition apply, i.e., that he is actually disabled or that he has a record of actual disability. Rather, he argues only that Crown regarded him as having a substantially limiting impairment under subsection (C).

An individual may qualify as disabled under the "regarded as" subsection in one of two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999); see also 29 C.F.R. § 1630.2(*l*) (defining "regarded as having such an impairment"). In either event, our focus is on an employer's subjective state of mind: did the employer mistakenly believe that the plaintiff was substantially limited in performing a major life activity? Sutton, 527 U.S. at 489. In answering this question, "[w]e analyze only the major life activity or activities asserted by the plaintiff." Rakity v. Dillon Cos., 302 F.3d 1152, 1158 (10th Cir. 2002) (citing Doyal v. Okla. Heart, Inc., 213 F.3d 492, 495-96 (10th Cir. 2000)). In the present case, Justice argues that Crown regarded him as substantially limited in the major life activity of working.[2]

_____

[2] On appeal, Justice asserts for the first time that Crown believed him to be substantially limited in the major life activity of "balance." Aplt. Br. at 25-28. Before the district court, Justice asserted only that Crown regarded him as substantially limited in the major life activity of working, thereby abandoning any reliance on other major life activities. See Aplt. App'x at 418-19. We thus consider only the major life activity of working. Similarly, Justice's arguments

(continued...)

To survive summary judgment on this claim, Justice must present some evidence that Crown believed that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." EEOC v. Heartway Corp., 466 F.3d 1156, 1162 (10th Cir. 2006) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). "[I]t is particularly difficult for a plaintiff to prevail on this type of claim," which "'takes a plaintiff to the farthest reaches of the ADA.'" Id. (quoting Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001)). It is not, however, "an insurmountable showing." Id. at 1163. We conclude that based on the record evidence, a reasonable factfinder could infer that Crown misapprehended the nature of Justice's impairment and the risks it posed, and so believed him to be significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes.

Crown argued, and the district court concluded, that "there is no evidence that the employer regarded Justice as disabled from performing the class of jobs, 'electrician,' in general." Aplt. App'x at 813. Our reading of the record, though, reveals evidence to the contrary. Richard Mangus, who took part in the decisions to suspend and ultimately reassign Justice, testified that Crown's initial safety

_____

[2](...continued)
that Crown committed "per se" violations of the ADA or constructively discharged him were not presented to the district court, and we do not consider them here.

12

concerns arose because "[a]s an electrician, [Justice] is subject to a lot of high voltages, electricity." Id. at 242:23-24. Mangus admitted that this was a concern for any electrician, but stated that specific concerns arose with Justice because "we didn't feel like he could work safely . . . [b]ased on his documented vertigo and balance." Id. at 243:7-9. Similarly, Bill Decker, who was Plant Supervisor at the time of the relevant events and also took part in the adverse employment decisions, gave deposition testimony about his perception of Justice's "inability to work on [high-voltage electrical] cabinets." Id. at 226:7. In Decker's opinion, Justice was unable to work on such cabinets "being that he was not steady enough to work in them." Id. at 226:10-11. "[H]e was too unsteady," in Decker's view, "to even be around current like that." Id. at 227:10-11.

These statements suggest that Crown at least initially believed that Justice's balance and vertigo problems could disqualify him from employment as an electrician *in general*—or, for that matter, from any employment where he might have to work with high voltages or electrical current. The statements undercut Crown's argument that it only believed that "Justice was unable to perform the job of electrician in [Crown's] plant" but could "work as an electrician in other environments." Aple. Br. at 19-20. Decker's and Mangus's statements do not relate specifically to the plant environment, but seem to indicate a broader fear that Justice's balance problems posed a safety hazard when working around electrical current in *any* environment. For this reason, we distinguish the present

13

case from the Supreme Court's decision in <u>Murphy v. United Parcel Service, Inc.</u>, 527 U.S. 516, 524 (1999), which held that an employer's belief that the plaintiff is incapable of performing a particular job only under certain conditions does not show that the employer believed the plaintiff to be incapable of performing an entire class of jobs.

Subsequent medical reports from Dr. Williams, Rhonda Wakai, and Dr. Spratt, none of which indicated that Justice had such a limitation, *might* have disabused Crown of that notion. There is, however, no indication that this was the case. In fact, there is evidence suggesting that Crown's concerns were not assuaged by the medical reports. After Dr. Williams and Ms. Wakai had issued their reports on October 31 and December 2, 2002, respectively, Mangus wrote to Ms. Wakai and gave her a description of the job duties of an electrician "[i]n order to get a determination regarding [Justice's] physical ability to safely perform his job functions." Aplt. App'x at 634. The letter seemed to presuppose that Justice's balance problems disqualified him from electrical work, describing the "[c]onstant requirement for good balance and steady posture due to requirements to perform work in energized electrical cabinets etc. . . . ." <u>Id.</u>

All of this evidence indicates that Crown believed that Justice's balance problems posed a threat when he was working around electricity, a belief unsupported by any of the medical opinions in the record. If Justice were in fact incapable of working around electricity due to this perceived impairment, this

14

would "significantly restrict" his ability to perform an entire class of jobs utilizing his skills, i.e., those jobs in the electrical field. Cf. Heartway, 466 F.3d at 1163 n.6 (providing a list of classes of jobs taken from other circuit court cases: "truck driving, assembly line jobs, manufacturing jobs, welding jobs, and animal care jobs" (quotation marks and citations omitted)). We therefore conclude that Justice has presented evidence supporting an inference that Crown mistakenly believed him to be substantially limited in the major life activity of working.

Also supporting this conclusion is evidence that Crown believed that Justice's balance problems significantly restricted his ability to perform a broad range of jobs. Richard Mangus admitted there were "only about two jobs in the plant" he thought Justice could do. Aplt. App'x at 538:2-3. This is consistent with Crown's later refusal to consider Justice for openings at the plant, all of which were available to someone with his level of skill and experience. While this action was taken in 2005, three years after the events at issue in this case, it may nonetheless shed light on Crown's state of mind at the time of those events. Cf. Heartway, 466 F.3d at 1165 n.9 ("Even though [the employer's] comments . . . took place four months after [the plaintiff] was terminated, a jury could reasonably infer that those comments were indicative of his beliefs at the time that he terminated [the plaintiff]."). The Worland plant does not, of course, represent a microcosm of all possible jobs, but a reasonable finder of fact could

15

infer from Crown's determination that Justice could only do one or two jobs among the variety of jobs in the plant that Crown believed that Justice was unable perform "a broad range of jobs in various classes." Id. at 1162 (citation and internal quotation marks omitted).

Crown argues that the foregoing evidence is effectively countered by other evidence in the record. Citing McGeshick v. Principi, 357 F.3d 1146, 1151 (10th Cir. 2004), and Rakity v. Dillon Companies, Inc., 302 F.3d at 1164, Crown asserts that the fact that it offered Justice another position in the factory shows that it did not regard him as substantially limited in the ability to work. While this evidence is certainly relevant to this inquiry, it does not support summary judgment in this case for two reasons.

First, the fact that Crown was willing to consider Justice for a single job does not show that Crown considered him unlimited in the major life activity of working. As noted, to meet his burden Justice must show that Crown believed he was restricted in performing either a "class of jobs" or a "broad range of jobs in various classes." Heartway, 466 F.3d at 1162 (citation and internal quotation marks omitted). Neither requires a belief that Justice is disqualified from *every* job imaginable. Crown's belief that Justice is able to perform a single job, or even a narrow subset of jobs, is entirely consistent with a belief that he is nonetheless unable to perform an entire "class of jobs" or a "broad range of jobs." The limited job offer in this case stands in contrast to McGeshick, in which the

16

evidence showed that the employer considered the plaintiff disqualified from only the particular job at issue, housekeeping aid, due to the physical requirements of the job. McGeshick, 357 F.3d at 1148. There was no indication that the employer considered the plaintiff disqualified from the entire class of similar housekeeping jobs, and the employer invited the plaintiff to apply for "other *jobs* . . . for which he might be qualified." Id. (emphasis added). Thus, the employer considered a number of jobs in its operation to be available to the plaintiff despite his limitations; in the present case, by contrast, the evidence indicates that Crown considered there to be at best only one or two jobs still available to Justice in the Worland plant.

Second, Crown's offer of a janitorial position does nothing to rebut the evidence suggesting that Crown believed Justice's balance problems rendered him incapable of performing the broad class of jobs involving electrical work. This distinguishes the present case from Rakity, in which the plaintiff's employer refused to consider him for a position as an "all purpose" grocery clerk because the requirements of the job included lifting in excess of the plaintiff's medical restrictions. Rakity, 302 F.3d at 1156. However, the employer continued to be willing to employ the plaintiff as a "general" grocery clerk, which "amount[ed] to undisputed evidence" that the employer did not regard the plaintiff "as unable to perform a broad class of grocery clerk jobs." Id. at 1164. Thus, the crucial fact in Rakity was that the job offered to the plaintiff was in the same "broad class" as

17

the job from which he had been disqualified. Here, while Crown offered Justice another job, the job did not fall within the same class of jobs, and thus sheds no light on whether Crown considered Justice "significantly restricted in the ability to perform" this class of jobs. Heartway, 466 F.3d at 1162 (citation and internal quotation marks omitted).

Crown also argues that by removing Justice from his position as an electrician, it was merely acknowledging his medical restrictions. This court has repeatedly held that "[w]here the recognition of Plaintiff's limitations is not an erroneous perception, but is instead a recognition of fact, a finding that Plaintiff was regarded as disabled is inappropriate." Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1241-42 (10th Cir. 2001) (citing Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999)). We also find this argument unconvincing. To begin, assuming Crown believed that it was unsafe for Justice to be around electricity, as the evidence suggests, the evidence indicates that this belief was not a "recognition of fact," but an "erroneous perception." Id.

Further, to conclude that Crown's demotion of Justice from electrician to janitor was based on his actual medical restrictions rather than this erroneous perception about his abilities would require us to resolve a disputed issue of material fact in Crown's favor. Crown argues that Justice's medical restrictions precluded him from working as an electrician because, under its version of the facts, the Worland plant was full of obstacles such as unprotected heights and

18

hazardous machinery. While this may be true, there is contrary evidence in the record from which a finder of fact could conclude that these hazards were imagined or exaggerated, and that Crown's purported reliance on Justice's medical restrictions was a pretext masking Crown's irrational fears about Justice's condition.[3]

There were two main restrictions imposed on Justice: he could not work at unprotected heights and he could not work around "hazardous" or "moving" machinery or equipment. Though the restriction against working at unprotected heights was in place long before 2002, Justice was able to work safely prior to that time, leading to the inference that he was able to do the electrician job despite this restriction. The only medical professional to express an opinion to

_____

[3] This discussion also has some bearing on the second and third elements of Justice's prima facie case: whether the plaintiff is qualified to perform the essential functions of the job, or whether the employer's adverse decision is the product of disability discrimination. See Zwygart, 483 F.3d at 1090. Because the parties address these concerns at the first element, though, we also do so here. Cf. Ross, 237 F.3d at 708 ("Because, under the 'regarded as' prong, [the plaintiff's] prima facie showing that he is disabled turns on the employer's state of mind and how it thought [the plaintiff's] condition affected his performance as an employee, evidence of the employer's state of mind that would ordinarily be used to prove motive or discriminatory intent may also be probative of [the plaintiff's] status as a person with a disability as defined by the ADA."). In addition, while we may affirm the district court's grant of summary judgment on any grounds supported by the record, we believe that a material dispute of fact remains as to both those elements. As is suggested in the discussion above, there is evidence that (1) Justice was qualified to work as an electrician in the plant notwithstanding his medical restrictions; and (2) Crown's removal of him from that position was due to unsubstantiated concerns about the dangers posed by his balance problems.

19

the contrary was Rhonda Wakai. Ms. Wakai's opinion that Justice should be encouraged to seek employment elsewhere is by far the strongest evidence in Crown's favor, as it speaks directly to Justice's ability to perform the duties of an electrician in the Worland plant, and neither Dr. Williams nor Dr. Spratt gave an opinion directly on this issue.[4]

Ms. Wakai only expressed this opinion, however, after touring the plant with Richard Mangus, one of the very supervisors who had expressed concerns about Justice's safety. This casts doubt on whether the tour accurately outlined the requirements of the electrician position, particularly because neither Justice nor a union representative accompanied Ms. Wakai on the tour, nor did Ms. Wakai see an electrician performing the tasks associated with that position during the tour. Two long-time employees of the plant expressed their view that Justice would not be required to access unprotected heights in his position as an electrician, or in any of the positions for which he was passed over. See Aplt. App'x at 439-41 (Stidolph Aff.); id. at 443-45 (Heckert Aff.). The objectivity of the tour, and consequently Ms. Wakai's opinion, is thus subject to dispute.

The restriction against working around moving equipment was imposed by Dr. Williams and reaffirmed by Dr. Spratt, Crown's corporate physician. Neither specifically expressed an opinion as to whether this affected Justice's ability to

---

[4] Notably, Ms. Wakai never specifically stated that Justice was incapable of working as an electrician at the Worland plant, but left the final approval or disapproval of Justice's workplace with Dr. Spratt. Aplt. App'x at 127.

perform the job of an electrician in the Worland plant. Rather, it was Crown itself, through its management, which reached this conclusion. The conclusion of Crown's management conflicts with the sworn statements of employees of the Worland plant that employees never had to work around machinery in an unprotected fashion and that any moving parts on the machinery were covered by guards. See id. at 439-41 (Stidolph Aff.); id. at 443-45 (Heckert Aff.). In addition, Justice testified that in his janitorial position, he was occasionally in close proximity to moving equipment such as lathes, mills, and drill presses, indicating that Crown may not have sincerely believed that this machinery was "hazardous" or posed a danger to Justice. Id. at 479-80. To the extent that these assertions conflict with other evidence in the record, this is an issue for the finder of fact to resolve. Cf. D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1228-29 n.5 (11th Cir. 2005) (holding that where an employer's decision is based on an erroneous application of plaintiff's medical restrictions to the work environment, a material issue of fact remains as to whether the employer regarded the plaintiff as disabled).

Based on the foregoing, we conclude that it would be premature to grant summary judgment on the basis that Crown did not regard Justice as "disabled" within the meaning of the ADA. A reasonable jury could conclude that Crown thought that Justice's balance problems substantially limited his ability to perform the class of jobs constituting electrical work or a broad range of jobs across

21

various classes, and that Crown's purported reliance on the opinions of medical professionals was a pretext used to cover for this unsubstantiated belief.

## B.     *Direct Threat*

"Under the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others." Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1290-91 (10th Cir. 2000) (citing Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1088 (10th Cir. 1997)); see 42 U.S.C. § 12113(a)-(b). "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

> The determination that an individual poses a "direct threat" shall be based on . . . a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r). Though the burden of showing that an employee is a direct threat typically falls on the employer, "where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that [he] can perform those functions without endangering others." McKenzie v.

22

Benton, 388 F.3d 1342, 1354 (10th Cir. 2004) (quotation marks, alterations, and citation omitted).

In the present case, it may be appropriate to assign Justice the burden of showing that he does not pose a direct threat, as he personally acknowledged that the position of electrician in the Worland plant can be "deadly" and that "lives are at stake." Aplt. App'x at 151. Even so, based on the same evidence already noted in the preceding section, we conclude that a triable issue of material fact exists as to whether Justice actually posed a direct threat to plant safety. There is, as noted, a question whether Ms. Wakai's opinion can be considered "objective." In addition, there is much evidence indicating that Justice's restrictions, as recognized by Drs. Williams and Spratt, may not have limited his ability to perform safely in his environment and that Crown's application of the medical judgments to the workplace was unreasonable.[5] Applying the factors set forth in

---

[5] The district court, in ruling on Crown's motion for summary judgment, concluded that it was "not in a position to second-guess the judgment of those medical professionals or the employer, Crown, in deciding what would be acceptable safety risks to Justice and/or others in the Worland plant." Aplt. App'x at 815. This presents several difficulties, which ultimately lead us to disagree with the district court's ruling. First, allowing the case to go to a jury would not require second-guessing the medical judgments involved—it would only require second-guessing Crown's application of those judgments to the workplace, or, in Ms. Wakai's case, examining the objectivity of the facts that formed the basis of her opinion. Second, to hold that one cannot second-guess an employer's conclusion regarding the safety risks posed by an employee would eviscerate the ADA's protections by permitting the employer to assert in nearly every case that it believed the employee's medical limitations posed a credible threat to his safety or the safety of others.

23

29 C.F.R. § 1630.2(r), while the risk of harm may have been permanent and the severity of the harm great, a reasonable jury could conclude that the likelihood of the harm was extremely small and that Justice therefore did not pose a "direct threat" to the safety of himself or others in the Worland plant.

## III.

The district court's grant of summary judgment to Crown is REVERSED and the case is REMANDED to the district court for further proceedings.