**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 18, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOANNE DIXSON-THOMAS,

Plaintiff-Appellant,

v.

OKLAHOMA COUNTY BOARD OF
COUNTY COMMISSIONERS,

Defendant-Appellee.

No. 07-6249
(D.C. No. 5:06-CV-00951-W)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

Plaintiff Joanne Dixson-Thomas appeals from the entry of summary

judgment for her former employer, defendant Oklahoma County Board of County

Commissioners, in this wrongful termination suit alleging discrimination under

the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

retaliatory discharge under the Oklahoma Workers' Compensation statute, *see* Okla. Stat. tit. 85, § 5(A). The district court held that the ADA claim failed for two reasons: Ms. Dixon-Thomas did not make a prima facie showing that she had a disability within the meaning of 42 U.S.C. § 12102(2); and the Board had, in any event, terminated her for a reason—extended absence from a key position in the County Court clerk's office—that did not violate the ADA. The court held that the latter reason for termination was likewise fatal to the § 5(A) claim and that Ms. Dixson-Thomas had failed to demonstrate a triable issue as to whether that reason was pretextual. On de novo review, *see Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1085 (10th Cir. 2008); *Blackwell v. Shelter Mut. Ins. Co.*, 109 F.3d 1550, 1553 (10th Cir. 1997), we affirm.

## FACTUAL BACKGROUND

The undisputed historical facts are set out in the district court's order. We summarize the facts that frame the issues to be resolved on this appeal. Additional facts will later be introduced as necessary to our analysis of each issue.

Ms. Dixson-Thomas worked at the Oklahoma County District Court Clerk's office as head of the docketing department, where she supervised docketing personnel and also did keyboard entry herself. In accordance with written policy, this was considered a "key" position that could not be left unfilled for an extended period. On October 10, 2000, Ms. Dixson-Thomas did not report to

work because of a problem with her wrist and arm, and has not returned to work since. She sent a letter dated October 17 to her supervisor, James Merritt, telling him that her doctor had instructed her to stay off work until various medical tests were completed. Merritt responded by asking for a more definitive return date, requesting that she periodically report in writing on her status and intent to return to work, and advising that she held a key-employee position that would have to be announced and filled within two weeks.

After Ms. Dixson-Thomas had been off work for over a month, she and Merritt met to discuss the situation. At the meeting she was unable to confirm whether she could return to work to perform her supervisory duties, nor would Merritt confirm whether she had been terminated, though he did say that he would be accepting applications for head of the docketing department. No one was hired for the position, however, and Merritt temporarily assumed the supervisory duties of the position. As requested, Ms. Dixson-Thomas periodically reported her medical status and her continued intention to return to work. In the meantime, she also filed a workers' compensation claim, specifying "carpal tunnel" as a cumulative injury resulting from "repetitive typing and lifting," on November 27, 2000. Aplt. App. at 293 (internal quotation marks omitted).

By letter dated January 23, 2001, Merritt asked Ms. Dixson-Thomas to consult with her doctor to determine whether she could return to work and perform her supervisory duties or answer telephone calls. If she were approved

for limited duty, he wanted her doctor to specify her limitations and capabilities with regard to giving verbal directions to employees, answering calls, and sitting and/or standing for eight hours. She submitted materials reflecting that her doctor had put her on temporary total disability (TTD). Under the workers' compensation scheme, this precluded her employer from terminating her "solely on the basis of absence from work." Okla. Stat. tit. 85, § 5(B).

That is how matters stood for some two years. The clerk's office was restructured, and docketing was combined with another department. This allowed supervisory duties once performed by Ms. Dixson-Thomas to be shifted to other personnel.

On February 27, 2003, Ms. Dixson-Thomas was released to work with restrictions, including limited lifting, restricted pushing/pulling, and reduced repetitive movements. She informed Merritt and inquired about returning to work. He replied that she would need to submit an application and that he could not discuss employment until her TTD status and workers' compensation claim were resolved. She did not submit an application. A few months later she filed an administrative charge of discrimination citing disability as one of the grounds.

Ms. Dixson-Thomas settled her workers' compensation claim on November 18, 2003, and Merritt was advised of the settlement no later than December 30, 2003. More than a month later, in response to an inquiry from Ms. Dixson-Thomas about a benefits matter, the human resources department

informed her that her employment with the clerk's office had been terminated effective December 31, 2003, over three years after she had first left work.

## DISCUSSION

An indefinite or excessive absence is a legitimate reason for termination under both the ADA, *see Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1065 (10th Cir. 2001) (citing cases), and state law (provided that the employee is no longer on TTD and thereby unconditionally protected by Okla. State. tit. 85, § 5(B)), *see Upton v. Okla. ex rel. Dep't of Corr.*, 9 P.3d 84, 88 (Okla. 2000), *superseded by statute on other grounds as stated in Glasco v. Okla. Dep't of Corr.*, 188 P.3d 177, 183-84 (Okla. 2008); *Pierce v. Franklin Elec. Co.*, 737 P.2d 921, 924 (Okla. 1987), *superseded by statute on other grounds as stated in Upton*, 9 P.3d at 86.  Ms. Dixson-Thomas acknowledges that "[t]hree years is admittedly a long time," but argues that her absence was not voluntary and therefore cannot be deemed a "job abandonment."  Aplt. Br. at 19-20.  We have never held, however, that excessive absence justifies termination only if the employee has "abandoned" her job.

The burden on the plaintiff to overcome a facially legitimate justification for termination is the same under federal and state law:  she must show that the justification was pretextual, either by direct evidence of a wrongful motive or indirectly by evidence that the proffered justification is unworthy of belief.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Buckner v. Gen.*

*Motors Corp.*, 760 P.2d 803, 807 (Okla. 1988). Indirect evidence may be a showing of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008) (internal quotation marks omitted). In assessing whether Ms. Dixson-Thomas has presented evidence creating a genuine issue of material fact, *see* Fed. R. Civ. P. 56(c), we must keep in mind the compelling nature of the Board's stated justification for her termination—her three-year absence from a key position.

Ms. Dixson-Thomas contends that the pretextual nature of the Board's asserted justification is revealed by "evidence of inconsistency and disturbing procedural irregularities" regarding her termination. As for inconsistency, she notes that the Board has in these proceedings stated both that "the County terminated her on December 31, 2003," Aplt. App. at 8 (Defendant's Motion for Summary Judgment), and that "[she] was not terminated," *id.* at 252 (Defendant's Answers to Plaintiff's Interrogatories). But the unprofessional game of semantics played by the Board's counsel in answering interrogatories does not undermine the client's justification for termination.

As for procedural irregularities, Ms. Dixson-Thomas complains that (1) her medical release from TTD was treated as a nullity during the pendency of the

workers' compensation proceedings, and (2) she was already being told that she would have to apply for work in the clerk's office when her employment status still had not been resolved. On the first point she says:

> It is important to note that Mr. Merritt told Ms. [Dixson-]Thomas she could not return *after* [February 27, 2003] because she was "still TTD." She immediately clarified that she was *no longer* TTD and referred to the provided doctor release. Merritt told her there was nothing he could do and she should "talk to her attorney" and have her attorney "contact the District Attorney." Further, he advised her to refrain from contacting him or other representatives of the Court Clerk's office. . . . "Your case is not over even though you have been released by the doctor. Because the case is not completely settled we consider you to be TTD and there is nothing I can do until it is over." Then, just one day after Mr. Merritt learned of the settlement of the WCC [claim], Ms. [Dixson-]Thomas is summarily terminated!

Aplt. Br. at 20-21 (record citations omitted). And on the second point she argues:

> How can an existing employee be forced to "put in an application" as a condition for continued employment all the while not being told if she was fired or not fired yet remaining an employee throughout the pendency of her underlying WCC case? The lack of communication as to job status lends further credence to the pretext argument. A law abiding employer would tell the employee exactly what her job status was upon her release [from TTD]. There was no reason to hide her job status from her. Doing so was disingenuous, contradictory, and arguably calculated to disguise unlawful discrimination. The death knell for summary adjudication purposes was firing this employee just *one day after learning she had settled her [claim]*, and this after keeping her in the dark for a period of ten months leading up to the discharge.

*Id.* at 22-23.

We are not persuaded that these points can demonstrate pretext. As noted earlier, by 2003 Ms. Dixson-Thomas had been absent from a key position in the

clerk's office for over two years, during which time the office had been restructured and her position abolished. Although this would clearly have justified her termination, under state workers' compensation law she could not be terminated until her protective TTD status expired. This period of postponed resolution continued beyond the date Ms. Dixson-Thomas obtained a work release from her doctor, because the clerk's office extended TTD protective status until the conclusion of workers' compensation proceedings. In this context Merritt's statement that the matter belonged in the hands of the parties' attorneys made perfect sense. For him to proceed on his own before the lawsuit was resolved would have risked inadvertent violation of Ms. Dixson-Thomas's rights or imposition on the clerk's office of some unintended responsibility. The statement neither contradicts the proffered explanation for Ms. Dixson-Thomas's termination nor otherwise suggests an improper motive for the termination. Likewise, the timing of the termination is not the least suspicious. It was the earliest that the termination was clearly permissible under the workers' compensation statute. Nor could pretext be inferred from the suggestion that Ms. Dixson-Thomas submit an application or from the failure to tell her whether or not she had been fired. Her status was complicated by both her being absent from work and the requirements of the workers' compensation statute. An inability to resolve that status is not surprising, and we fail to see how the inability suggests an improper motive.

For "direct" evidence of an improper motive, Ms. Dixson-Thomas relies on allegations of hostility toward her workers' compensation claim—in particular, Merritt's statement, before he knew that she had filed a claim, "How do I know that it was an on the job injury? As far as I know, you could have fell off a horse." Aplt. App. at 102, 111 (internal quotation marks omitted). She insists that "[t]he tone and tenor of Mr. Merritt's comment was calculated to intimidate [her] and discourage her from pursuing a job injury claim." Aplt. Br. at 5. But there is no evidence of any effort to deny Ms. Dixson-Thomas's workers' compensation claim. Indeed, when specifically asked in her deposition if her employer had fought against her claim for benefits, she could say only that she did not know.[1] What we do know from our record is that her claim was resolved by a settlement that gave her a $12,800 benefit and a $3,200 fee award.

_____

[1] She also refers to two clerk's office documents that she says downplay the obvious job-related nature of her injury. *See* Aplt. Br. at 17. Neither of these, however, suggests an improper effort to oppose her claim. One is a short memo written by Merritt when he received notice of her claim, summarizing the few relevant dates and facts of which he was then aware. It recites that the last day she worked was October 6, 2000; that her workers' compensation form specified October 10, 2000, as the day her injury occurred; and that she had not previously reported a work-related injury. There is no evidence that this memo was submitted in opposition to her claim. And, in any event, it simply recites objective facts. The other is simply a note on a doctor's statement that Ms. Dixson-Thomas had submitted, stating that "[t]his doctor's statement is dated 2 days before any claim by [her] that her condition was 'workers' comp' related. She signed her claim on Nov 22, 2000." Aplt. App at 217. Again, this does not show some wrongful effort to oppose her claim.

In sum, we agree with the district court that Ms. Dixson-Thomas failed to present a triable issue of improper motive. For this reason, we need not reach the district court's alternative rationale for rejecting the ADA claim—namely, that Ms. Dixson-Thomas had no disability under 42 U.S.C. § 12102(2)(C).[2]

The judgment of the district court is AFFIRMED.

Entered for the Court

Harris L Hartz
Circuit Judge

---

[2] Under § 12102(2), as relevant here, "[t]he term 'disability' means . . . (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded as having such an impairment." Ms. Dixson-Thomas alleged that she was regarded as having an impairment that substantially limited her major life activity of working.