FILED
United States Court of Appeals
Tenth Circuit

February 9, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ARTHUR FRYER,

     Petitioner - Appellant,

v.

COIL TUBING SERVICES, LLC.,

     Respondent - Appellee.

No. 09-8105
(D. Wyo.)
(D.C. No. 2:09-CV-00004-WFD)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

---

     Arthur Fryer appeals from a summary judgment entered in favor of his employer,

Coil Tubing Services (CTS).  After working for CTS less than two months, Fryer was

---

     [*]This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished).  *Id.*

diagnosed with Hepatitis C.[1]  Four months later, he informed CTS his condition had worsened.  Fryer was put on leave with full pay and benefits for approximately three months.  Less than three weeks after returning to work, Fryer injured his back while at home and went on short-term disability pay for three months.  When he attempted to return to work and was told CTS had no light-duty work meeting his doctor's restriction, Fryer sued under the Americans with Disabilities Act (ADA) claiming CTS considered him disabled and believed his presence at work was a liability to the company.  He also claimed CTS retaliated against him and he was constructively discharged.  The district court concluded Fryer failed to raise a genuine issue of material fact as to any issue because he failed to demonstrate CTS considered him disabled or took any adverse action against him.  We affirm.

## I.    FACTUAL BACKGROUND

CTS hired Fryer in late November 2006, as a Service Tech II (ST II) in its Rock Springs, Wyoming, office.  An ST II is responsible for driving semi-trucks; the drivers are regulated by the Department of Transportation (DOT) because the trucks regularly transport hazardous material to the field.  In January 2007, Fryer was diagnosed with Hepatitis C.  He told his District Manager, Oscar Molbert, and several other supervisors about his diagnosis, but continued to work for CTS without incident until April 2007.

---

[1] "Hepatitis C is a contagious liver disease that ranges in severity from a mild illness lasting a few weeks to a serious, lifelong illness that attacks the liver.  It results from infection with the Hepatitis C virus (HCV), which is spread primarily through contact with the blood of an infected person . . . .  [It] is not spread by sharing eating utensils, breastfeeding, hugging, kissing, holding hands, coughing, or sneezing.  It is also not spread through food or water."  *See* http://www.cdc.gov/hepatitis/C/cFAQ.htm (last visited January 14, 2011).

On April 16, 2007, after having undergone a liver biopsy in the normal course of treatment, Fryer discovered his disease had progressed to chronic Hepatitis C, Stage III (out of IV stages), Type IB. At the request of Fryer and his wife, Dawn, nurse practitioner Deborah Cobb wrote a letter explaining:

> Arthur . . . is suffering from chronic Hepatitis C with moderate liver damage at this time. He has reported that he is sleeping poorly, loosing [sic] weight as he has had no appetite since finding out that he has chronic Hepatitis C. He also reports increased fatigue.
>
> We do not have plans to begin any treatment for Arthur a[t] this time as he needs a mental health assessment and clearance prior to any consideration for treatment as side effects of treatments can be significant.
>
> He has requested that I write this letter so that he may inform his employers of his disease. He does not currently have any debility from his chronic Hepatitis C except fatigue which should not preclude his working.

(R. Vol. IV at 691.) The same day, Fryer and Dawn provided the letter to Fryer's immediate supervisor, Operations Manager Robert Gibbs. They informed Gibbs that Fryer was experiencing fatigue and depression and the treatment's side effects could include suicidal thoughts.[2] Dawn told Gibbs the treatment, once started, would last forty-eight weeks.

On April 23, 2007, Fryer met with Molbert and Tiffany Letchworth, the Human Resources Manager at CTS's office in Louisiana, who participated by telephone. During their discussion, Fryer expressed concerns about his job and stated he felt tired and depressed. He also told them he would be under an intense forty-three week treatment

---

[2]Cobb also wrote a second letter on April 16, 2007, stating "a significant adverse effect of this treatment may lead to increased depression with possible suicidal and homicidal ideation . . . ." (R. Vol. IV at 665.) It is unclear if this letter also was provided to Gibbs during this meeting or whether this information was orally provided.

plan with a side effect of suicidal thoughts. Later that day, Letchworth e-mailed Molbert

and David Hebert, Vice-President of Operations, stating:

> In following up to our conversation this morning, it is my recommendation to send Arthur home, with pay, allowing him time to obtain the medical documentation (release) requested of him. I am attaching a functional job description for him to provide to his doctor for review and consideration. In addition, as I communicated, *I am ignorant to this disease; however, take his word that it is transmitted through blood*. With that information alone, I feel it is in the best interest [of] our personnel to remove Arthur f[ro]m a work environment at this time. Should management feel differently, please let me know. This is simply my recommendation.

(R. Vol. IV at 673 (emphasis added).)

Two days later, on April 25, Gibbs called Fryer into the office. According to

Fryer, Gibbs also had the office assistant, Melinda Mortensen, come in. Gibbs then said,

"I don't want to be the one to do this, but higher powers left it up to me to do it. They

want you to go home, get a physical according to your job description, before you come

back to work." (R. Vol. I at 76.) Mortensen left the room and Gibbs "sat down in front

of [Fryer] and he said, 'What if you cut yourself and blood splatters in someone's face or

eyes? They can catch what you have.'"[3] (*Id.*)

Mortensen returned and Fryer, still in Gibbs' office, spoke with Letchworth on the

telephone. He asked if he was being fired. Letchworth told him no, but pursuant to

company policy, after six months of inactive duty his employment would be terminated

---

[3]Gibbs denies making this statement. But Dawn Fryer testified she spoke with Gibbs the same day her husband was sent home. Gibbs told her Fryer was "a risk to the employees and a liability to the company." (R. Vol. II at 343.) One of Fryer's co-employees testified that Gibbs and Molbert discussed Fryer's condition with several workers and told them Fryer was "too much of a liability to have [t]here." (*Id.* at 290.)

- 4 -

and he would be offered COBRA benefits.[4] Letchworth agreed to send Fryer's paperwork for short-term disability directly to his liver specialist and he was provided a functional job description for his primary physician's use in his medical examination. Fryer went home conditioned on him getting a physical examination and release. He received full pay and benefits until he returned to work on July 30, 2007, and this period of paid leave was not counted as inactive duty.

On May 4, 2007, nine days after Fryer was sent home, Letchworth fulfilled her promise to send the short-term disability packet to Fryer's liver specialist, Dr. Cole. She also used that time to educate herself on the nature of Hepatitis C. She spoke with Kathy, a staff nurse at Dr. Cole's office, who sent a facsimile transmission containing information regarding the transmission of Hepatitis C.

In an e-mail dated May 18, 2007, to Douglas Frankhouser, the head of human resources for CTS's parent company, Houston Frazier, CTS's executive vice-president and General Manager, and others, Letchworth reported, "[m]y concern is [Fryer's] open disclosure of being fatigued and depressed and allowing him to perform safety sensitive work (driving tractor trailer trucks) . . . . In [the nurse's] opinion, Artie is currently fit for work with this condition. However, as she stressed, his depression and tiredness is another issue; one in which he is not under Dr. Coles [sic] care for." (R. Vol. IV at 737.)

---

[4]COBRA is an acronym for the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-68, which "authorizes a qualified beneficiary of an employer's group health insurance plan to maintain coverage when she might otherwise lose coverage upon the occurrence of a 'qualifying event.'" *Simpson v. T.D. Williamson Inc.*, 414 F.3d 1203, 1204 (10th Cir. 2005).

She also informed him she had received the pamphlet with information on Hepatitis C and stated Fryer was scheduled to undergo a psychiatric evaluation on June 6, 2007, a necessary pre-requisite to treatment. She reiterated the continuing concern about Fryer's depression and fatigue and asked for input.[5] Frazier responded that Fryer should continue on paid leave due to concerns regarding the level of his depression.

On May 21, 2007, a statement signed by physician assistant Amy Olson and Dr. Kurt Hunter of the Hunter Family Medical Clinic was sent to CTS. It stated:

> Mr. Fryer is currently a patient at Hunter Family Medical Clinic who asked me to evaluate his medical status in relationship to his job description. It is my professional opinion at this time, given Mr. Fryer's current health conditions, that he is capable of completing all tasks listed in your employee General Job Description. If you have any questions, or desire to discuss this matter further please feel free to contact me at the above listed phone number.

(R. Vol. IV at 670.) Letchworth's notes indicate she made several attempts to discuss the communication further, leaving messages to speak to Olson or Hunter on May 29 and June 1, 2007. Her notes also reflect she left a message for Fryer to return her call on June 14, 2007. On June 22, 2007, Letchworth telephoned again and spoke with Dawn Fryer. Letchworth asked whether Fryer was mentally ready to return to work. Dawn states she told Letchworth: "[O]f course he was mentally capable of doing his job and when are you going to put him back to work." (R. Vol. II at 344.) Letchworth's notes reflect Dawn said Fryer was seeing a mental health professional and was mentally capable of starting treatment but it was unknown when the Hepatitis treatment would begin. Fryer, however,

---

[5]In a May 7, 2007 e-mail, Letchworth noted Fryer had used all his vacation and, due to his short tenure with the company, was not eligible for sick leave or federal leave under the Family Medical Leave Act.

testified he followed through with a mental health care provider but was not cleared for treatment in June 2007. Fryer and Dawn claim the couple heard nothing more from CTS. But, for his part, Fryer conceded he never inquired about his work status when he retrieved his check at the CTS office each week.

Although the date is not certain from the record, at some point Letchworth spoke with Amy Olson on the telephone. Letchworth discovered Olson had conducted the May 21, 2007 medical examination. Letchworth asked whether Fryer had disclosed his fatigue and depression at the time of the examination. Olson stated she would review the file and get back to Letchworth. On July 19, Letchworth received a return call from Dr. Hunter stating he was going to conduct a second examination.

During the same time-frame, Dawn Fryer's affidavit states she telephoned Frankhouser. She complained her husband had submitted a letter from his physician clearing him for duty but CTS still refused to allow him to return to work. Within one hour of her call, the Fryers received a telephone call from Dr. Hunter's office setting an appointment for another examination. Also during the same time period, Fryer filed an ADA charge of discrimination with the Equal Opportunity Employment Commission (EEOC) office in Denver against CTS. The claim was forwarded to the Wyoming Department of Employment's Fair Employment Program,[6] which is designated to receive both federal and state employment complaints.[7] *See* Wyo. Stat. Ann. § 27-9-104(a)(iii).

---

[6] CTS received the claim sometime in mid-August. *See* discussion *infra* at 18.

[7] Before a plaintiff may file suit under the ADA, he must exhaust his administrative remedies by filing a charge with the EEOC. *See McKenzie v. City & Cnty of Denver*, 414

Fryer was examined by Dr. Hunter on July 24, 2007. Following the examination, Hunter telephoned Letchworth and reported "that [Fryer's] depression is controlled at this time. In addition, it was communicated to [Fryer] that he is not to take impairment[-]causing medication while working, to which he is able to accommodate. In addition, [Fryer's] [H]epatitis C is controlled at this time and poses no significant risk to others." (R. Vol. IV at 692.) The next day Letchworth informed Molbert that Fryer could return to work.

Fryer reported for work on July 30, 2007.[8] He testified that upon his return, he was not assigned to the field with his crew but, instead, worked in the shop. He "felt [he] was being isolated" and his co-workers "acted as if [he] was contagious." (R. Vol. II at 316.) He also felt "as if [he] was being watched more closely by [his] supervisors." (*Id*.)

Sometime during the weekend of August 16-18, 2007, Fryer injured his back at home and went on short-term disability.[9] On November 7, 2007, he received a release to return to work on November 12, but the release limited his lifting activities such that it required a light-duty assignment – well below the lifting requirements of the CTSII position. When he reported for work on the 12th, Molbert and Molbert's new

---

F.3d 1266, 1274 (10th Cir. 2005).A plaintiff in a state in which a state agency has the authority to investigate employment discrimination claims, must file with the state agency. 42 U.S.C. § 2000e-5(c); 29 C.F.R. § 1601.3.The Wyoming Fair Employment Program has such authority. *See* Wyo. Stat. § 27-9-104(a)(iii).

[8] When Fryer returned, he began recording conversations with his co-workers and supervisors.

[9] CTS offered short-term disability benefits for employees who had completed thirty days of service and could not work due to a personal accident. The benefits paid 60% of the employee's wages up to $500.00 per week. Fryer received the maximum $500.00 per week.

replacement, Russ Robison,[10] met with Fryer and told him there was no light duty available. When Fryer told them "the disability company [was] a pain in the ass," they advised him to talk with Letchworth to resolve any problems he had with the short-term liability provider. (R. Vol. II at 334.) On November 13, the short-term disability provider wrote to Fryer and based upon "updated information from [his] doctor," informed Fryer it would pay benefits up to November 19, but he must provide medical documentation that he was partially or totally disabled for the benefits to continue.[11] (R. Vol. IV at 708.)

Fryer delivered another medical work release to CTS dated November 21, 2007, which released him for "regular duty" beginning November 26, but it contained lifting restrictions identical to those in the first release, effectively limiting him to light duty work. Robison again told him he needed to bring a restriction-free release before he could return to work because there were no available light-duty assignments. On November 26, Letchworth sent a facsimile transmission to Fryer's doctor asking him to reevaluate Fryer's release to "regular" duty because Fryer was "still unable to fulfill his essential[] job duties due to the lifting restrictions . . . ." (R. Vol. IV at 697.)

Fryer submitted his resignation to Robison on November 27, 2007. He testified he could not afford to stay with CTS without being paid and he felt his relationship with

_____

[10] CTS hired Robison to replace Molbert in October 2007. Molbert spent approximately one month acclimating Robison to the position before returning to CTS's Louisiana office.

[11] It appears the medical providers sent a copy of the release directly to the short-term benefits providers.

CTS was deteriorating. Two days later, on November 29, 2007, the short-term disability provider sent Fryer a letter denying an extension of his benefits based on the latest work release. Fryer was told, however, additional benefits would be considered if Fryer provided medical documentation supporting "continued restrictions and limitations from [his] occupation." (*Id*. at 695.)

## II. PROCEDURAL BACKGROUND

Fryer filed an ADA claim against CTS claiming discrimination, retaliation and constructive discharge.[12] CTS moved for summary judgment. The district court decided summary judgment was appropriate for several reasons. First, Fryer was not a qualified individual with a disability under the ADA because he failed to present evidence that he was actually disabled or that CTS considered him disabled. In addition, even if he had shown CTS considered him disabled, it did not discriminate by taking an adverse employment action against him; a temporary leave with full pay and benefits was a reasonable accommodation while CTS determined if he could perform his duties. The court dismissed Fryer's retaliation claim because he failed to demonstrate any adverse action by CTS following his discrimination claim. Finally, it determined Fryer's constructive discharge claim failed because he had not shown the conditions of employment left him with no choice but to quit.

## III. DISCUSSION

"We review the grant of summary judgment de novo, taking the facts and the

---

[12]Fryer also brought an ERISA claim on which CTS was granted summary judgment. Fryer did not appeal from that decision.

reasonable inferences to be drawn from them in the light most favorable to the nonmoving party." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Applying the same legal standard as the district court, we will affirm summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009). The movant "bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact;" if this burden is met, it then becomes the responsibility of "the non-moving party to set forth specific facts showing there is a genuine issue for trial." *Trainor*, 318 F.3d at 979. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quotations omitted).

A.    ADA Violation

The ADA prohibits certain employers from discriminating against individuals because of their disabilities. *See* 42 U.S.C. § 12112(a).

> A prima facie case of ADA discrimination consists of three elements: the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.

*Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008).

"Disability" is defined as follows:

> The term "disability" means, with respect to an individual -

- 11 -

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(2)).

B.     Regarded As Disabled

Fryer does not claim he was actually disabled.  Instead, he contends he is a qualified individual under the ADA because CTS regarded him as disabled.  Fryer can establish his "regarded as" claim in either of two ways:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual . . . .

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).[13]

Fryer argues CTS regarded him as disabled in the life activity of working[14] because

---

[13] In *Sutton*, the Supreme Court held "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment . . . ."  527 U.S. at 475.  The ADA Amendments Act of 2008 ("ADAAA") rejected consideration of mitigating measures.  ADAAA, § (4(a) (now codified at 42 U.S.C. §12102(4)(E). But, because Fryer's claim occurred in 2007, the ADAAA does not apply.*See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 n.2 (10th Cir. 2009).  In any event, mitigation of Fryer's impairment is not at issue here.

[14] Working is a "major life activity."  42 U.S.C. §12102(2); 29 C.F.R. § 1630.2(i); *see also EEOC v. Heartway Corp.*, 466 F.3d 1156, 1162 (10th Cir.2006).  The employee must be:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major

- 12 -

it considered his Hepatitis C to make him a danger to others. He points to Gibbs' remark (when telling him to go home) about the danger he presented to co-workers, the content of Letchworth's April 2007 e-mail, the disclosure to his coworkers regarding the possibility of contamination, his treatment when he returned to work in July and CTS's refusal to give him light-duty work when he attempted to return in November. He claims these actions demonstrate CTS was "operating out of ignorance," "motivated by fears and stereotypes" and under the belief Fryer was unsafe in any work environment, not just driving federally-regulated vehicles as CTS suggests.[15] (Appellant's Br. at 16.)

Fryer also contends CTS's explanation for sending him home – his depression and fatigue – is pretext. He points to CTS's failure to specifically mention these symptoms, to either he or his doctors, as the reason he needed medical assessment. He claims CTS offers no explanation why it did not request a mental examination if, in fact, those concerns were genuine. In addition, despite the work release from the Hunter Family Medical Clinic on May 21, 2007, CTS failed to call him back to work until Dawn Fryer called the parent company and complained.

The district court rejected the pretext argument. Given Fryer's self-disclosures in April 2007 regarding his fatigue, depression and the progression of his disease, the court

---

life activity of working.

*Heartway Corp.*, 466 F.3d at 1162.

[15] In the alternative, Fryer claims even if CTS's misperception was limited to only his ability to drive a federally-regulated truck, the company still regarded him as unable to perform any class of jobs for which a commercial driver's license (CDL) was a condition of employment – a condition common to oilfield work.

concluded CTS's concern about Fryer's ability to safely drive semi-trucks with hazardous material and its request that he obtain medical clearance were reasonable. Rather than evidence of a misperception of his condition, it demonstrated CTS had arrived at no conclusion as to the actual nature of his condition. In addition, Fryer received full pay and benefits while CTS researched its concerns and he was immediately scheduled for work when CTS received a satisfactory clearance from his doctor.

We agree. Gibbs' remarks on the day Fryer was sent home may have shown a misperception regarding the transmission of Hepatitis C and Letchworth clearly admitted she was "ignorant to this disease." (R. Vol. IV at 673.) But the ADA does not require an employer to unwittingly risk the safety of its employees or the public. Being temporarily uncertain of a situation is not the same as considering an employee disabled. "Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims . . . " *Lanmam v. Johnson Cnty, Kan.*, 393 F.3d 1151, 1157 (10th Cir. 2004) (quotations omitted). It was not unreasonable for CTS, given Fryer's disclosure, to give him an opportunity to establish his ability to safely work in the environment and to provide him full pay while it researched the situation.

Although CTS did not directly address Fryer's depression and fatigue in its request for a medical examination, that failure does not establish a factual question as to whether CTS's explanation for its action was pretext. Fryer fails to acknowledge undisputed facts – concerns about his fatigue and depression were the subject of CTS internal e-mails as early as May 7, 2007, before he submitted the work release from Hunter Family Medical Clinic on May 21. Moreover, Letchworth made several unsuccessful calls to the clinic's

medical staff to further discuss this release. Concerns regarding Fryer's mental and physical state were also conveyed in Letchworth's telephone call with Dawn Fryer in June. Ultimately, Letchworth's e-mail to Molbert after Dr. Hunter's July 2007 examination reflected these exact concerns had been allayed by Fryer's physician. There is no evidence that CTS hesitated to reschedule Fryer for work once it was assured he could safely return. The district court did not err in concluding CTS did not consider him disabled and, therefore, he was not a qualified individual under the ADA. Because Fryer must demonstrate he is a "qualified individual" as an essential element of his ADA claim, and he has not done so, we need not address the remaining elements. *Hennagir*, 587 F.3d at 1261-62.

C.     Retaliation

"To establish a prima facie case of retaliation, a plaintiff must show: (1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the [employer's] challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* at 1265 (quotations omitted).

> The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (quotations omitted).

- 15 -

While acknowledging that Fryer's filing an ADA claim met the first element of his prima facie case, the district court concluded he failed to demonstrate the second two elements – an adverse action causally connected to the activity.

Fryer contends CTS retaliated when it refused to provide him a light-duty assignment in November after his temporary disability benefits came to an end. He argues it is uncontested that drivers routinely worked in the shop when field work was unavailable. He points to the fact he was assigned to work in the shop prior to his paid leave in April (when he had no lifting restrictions) and when he returned in July (again, he had no lifting restrictions). He argues the shop work could have been manipulated to meet the lifting restrictions required by his work release and, in the past, other injured employees were given light-duty work in the shop.

In the district court, Fryer pointed to two CTS employees' affidavits as evidence that other injured employees were allowed to work in the shop. He also cited to Mortensen's deposition testimony as allegedly supporting CTS's policy to provide light-duty work to employees with lifting restrictions. The district court determined Fryer's evidence was insufficient to avoid summary judgment. We agree. *See Tinkle v. Okla. Gas & Elec. Co.*, 16 Fed. Appx. 815 (10th Cir. 2001) (unpublished) (prima facie case fails when no evidence of specific light-duty work).[16]

Neither employee's affidavit attested to a company policy which provided light-

---

[16]Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Tinkle* as we would an opinion from another circuit, persuasive because of its reasoned analysis.

duty assignments for off-duty injuries at the time Fryer requested his light-duty assignment. Mortensen clarified she believed the company only gave light duty assignments *if the injury was work-related* – unlike Fryer's situation. Moreover, no witness identified a particular opening in the shop at the time of Fryer's request.

Fryer also failed to establish a causal connection between CTS's allegedly adverse actions – the failure to employ him on a light-duty status and his isolation upon his return to work – and his charge of discrimination.[17] The exact date CTS learned of Fryer's discrimination charge is unclear. Fryer claims he filed his charge on July 24, 2007. However, the charge itself represents it was received at the Equal Employment Opportunity Commission office in Denver on July 23, 2007, and then received by the Wyoming Fair Employment Program office on August 15, 2007. Letchworth testified she first became aware of the charge "[i]n the middle of August." (R. Vol. III at 579.) There is no other evidence in the record regarding the date CTS became aware of Fryer's claims.

The record shows Fryer last worked on August 15th, 2007; his injury occurred sometime between the 16th and the 18th. Thus, the alleged adverse treatment in August occurred prior to the time CTS knew of his charge. And clearly CTS's actions following August 15, 2007 – the provision of short-term disability benefits to an injured employee – belies an intent to dissuade "a reasonable worker from making or supporting a charge of

---

[17]Fryer relies exclusively on "the proximity in time from the receipt of the discrimination charge, the hostility and isolation Mr. Fryer experienced upon his return to work [on July 30, 2007], and the pretextual nature of [the] proffered non-discriminatory reason for the employment action." (Appellant's Br. at 37-38.)

discrimination." *White*, 548 U.S. at 68.

Almost three months passed between August 15 and Fryer's release to work on November 12, 2007.  "[U]nless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).  A three-month gap, standing alone, between the filing of his claim and the challenged employment action does not permit an inference of causation.  *Id.*; *see also Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (concluding three-month gap between protected activity and termination was not close enough to establish causation in light of all the facts).  Because Fryer presents no other evidence of causation or a materially adverse action, he fails to present a material issue of fact on this element of his claim.

D.      Constructive Discharge

"The plaintiff's burden in a constructive discharge case is substantial . . . ." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007).

> Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  Essentially, a plaintiff must show that she had *no other choice* but to quit.  The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant.

*Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 534 (10th Cir. 1998) (citations and quotations omitted), *see also Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. Of Trs.,* 610 F.3d 558, 565 (10th Cir. 2010) (under an objective test, "neither [the employee's]

subjective views of the situation, nor [the employer's] subjective intent are relevant").

"In contrast, a plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir.2004).

Fryer claims the loss of his short-term disability income and the denial of light-duty work made it impossible for him to continue working for CTS on unpaid leave. After a thorough review of the facts in the light most favorable to Fryer, the district court concluded:

> Under the instant facts, the Court cannot find that Fryer was constructively discharged. First, Fryer offers no factual circumstances that rise to the level that a reasonable person would find intolerable. Second, the Court is skeptical that Fryer was left with no alternative but to resign, particularly since he admits that he never inquired into other alternatives. Accordingly, Fryer has not shown a genuine issue of material fact exists as to his constructive discharge claim.

(R. Vol. IV at 769.)

Relying on essentially the same facts as those used to support his discrimination and retaliation claims, Fryer argues he reached "the moment when [he] realized that he would not be permitted to return to work if the company could find any way to keep him from it, and that he would not be making any income while he continued to try." (Appellant's Br. at 40.) But because Fryer's "facts fail to meet the threshold required for a retaliation claim – a material adverse harm – it follows that those same facts cannot satisfy the higher threshold required for a constructive discharge claim." *Johnson*, 594 F.3d at 1217 n.6. Although Fryer may have subjectively believed he correctly ascertained CTS's intent, the test is an objective inquiry. Fryer presented no objective

evidence showing his work conditions were intolerable or that CTS would not assign work once he was able to return with a full release.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge
